KIRKPATRICK and others *v.* ADAMS and another.

*(Circuit Court, W. D. Tennessee. April 30, 1884.)*

1. CONTRACTS—GAMBLING—FUTURES—OPTION.

If the parties intend in fact to buy or sell actual cotton, to be delivered at a future time agreed upon by them, it is not a gambling transaction, although they exercise the option of settling the difference in price rather than make delivery; but if the original purpose be not to deliver cotton but to use the form of a contract for a genuine sale, as a method of merely speculating in the fluctuations of the market price, the contract is void, although there be an option of veritable sale and delivery. It is a question of fact for the jury to determine the intention.

2. SAME—PRINCIPAL AND AGENT—BROKER.

Where the principal employs an agent to buy "futures," if the dealings be illegal as gambling transactions, the agent cannot recover his advances and commissions, as he is the active agency engaged in placing the contracts and directing the business.

3. SAME—KNOWLEDGE OF THE PRINCIPAL—INTENTION OF THE AGENT—TEST OF ILLEGALITY.

Where the defendant employed the plaintiff to buy "futures" in the market of the plaintiff, without specific instructions or restrictions, the plaintiff may assume that the business is to be done by the rules or custom established for himself; and the defendant's knowledge of that custom is not material; neither is his intention to engage in gambling in prices material in determining whether the contracts actually made were illegal; but the test of illegality is the intention of the plaintiff and the other parties to the contracts. If they intended to make contracts for actual delivery, and not for gambling in prices, the defendant is bound for the advances and commissions, although he intended and supposed he was only gambling in prices.

4. SAME—EVIDENCE—BURDEN OF PROOF.

While the law presumes that every man's contracts are intended to be legal until the contrary appears, and the defendant who sets up illegality must prove it, there is no presumption that any particular contract is valid or invalid, and the plaintiff must prove the case made by his declaration. In doing this, if it appears that the dealings were illegal, he cannot recover, and the jury is to follow the presumption of legality only where there is no proof whatever to satisfy them to the contrary.

5. NEW TRIAL—VERDICT AGAINST THE WEIGHT OF THE EVIDENCE.

It is difficult to draw the line, but in the exercise of its power to set aside a verdict, because contrary to the weight of the evidence, the court must be careful not to subvert the right of trial by jury by usurping the function of deciding the facts. Where there is substantial evidence to support the verdict the court will not disturb it simply because the judge may differ with the jury about the weight of the evidence.

The plaintiffs sued the defendants for a balance due by account, and the plea of defendants sets up that the balance arose out of contracts for gambling in "futures." The plaintiffs were commission merchants doing business at New Orleans, and the defendants, country merchants doing business at Trezevant, Tennessee. During the season the defendants shipped cotton to the plaintiffs, which was sold for account, of defendants, who drew drafts in the usual way. From time to time defendants also ordered the plaintiffs, by telegram and letter, to buy for them "one March," "one April," etc., and would instruct them to "cover our March," or "close our Aprils," etc. At the end of the season there was a balance due the plaintiffs on the account. The senior member of defendants' firm also had an account with plaintiffs, on which there was a balance due him about equal to the balance due plaintiffs from the defendants. Correspondence about settlements arose, in which representation was made that defendants were in need of money, and a request that plaintiffs should pay what was due the senior Adams and carry over the firm account until the next season, when it should be paid. Plaintiffs consented to this, and forwarded the money due the senior Adams, but upon its receipt defendants remitted to plaintiffs the sum which they found due on account of shipments of cotton, and informed them that the balance due for losses on "futures" would not be paid; whereupon this suit was brought.

The plaintiffs testified that they were members of the New Orleans cotton exchange, and dealt for defendants under its rules, which were put in evidence, showing the forms of contracts for future delivery, and the other rules governing such dealings. They explained that "one April" meant 100 bales of cotton for delivery in April; and showed in detail all the dealings had on the orders of defendants entering into the account, and exhibited the whole correspondence by telegram and letter. They testified that the contracts were *bona fide*, and for actual delivery in every case; that they were, on the order of defendants, transferred or sold before maturity to other parties; that the business of buying and selling under such contracts was carried on by a system of clearing-house settlements between the merchants or brokers, the contracts being protected by margins advanced by them on account of defendants, until the maturity of the contract, when the cotton was either actually delivered to the holder of the contract, or a settlement had of the differences, at the option of the holder. They testified that, as a matter of fact, only about 2 per cent. of the contracts were settled by actual delivery of cotton, but that, notwithstanding this fact, it was well understood in the cotton exchange that these contracts were for *bona fide* sales and purchases of real cotton, and not a settlement of mere differences, as in the "bucket shops."

One of the defendants testified that they knew nothing of the rules of the New Orleans cotton exchange, or its method of dealing, and

that, wishing to speculate in "futures," they had given the orders to plaintiffs; had been guided in their dealings by their advice as to closing out the contracts, when the market broke down and the panic ensued, out of which the losses arose; and that they had no intention to buy or sell actual cotton, and did not authorize such contracts, but intended only to speculate in prices.

The court charged the jury as follows:

HAMMOND, J. The plaintiffs were commission merchants in the cotton trade, and the defendants were their customers. The suit is that of the factor against the customer for the balance of account. There were between the parties "spot" transactions and transactions in "futures." The former, covering cotton in fact consigned to the factor and sold for the account of the customer, have been fully settled by the parties, and are eliminated from the account, the balance claimed being wholly composed of advances made by the factor for the customer on account of the transactions in "futures" and the factor's commissions.

Before considering the subject of gambling in its bearing on this suit it is proper to dispel any confusion that may exist in the minds of the jury as to the relation of certain facts in proof to the main inquiry:

*First.* This is not, in any sense, a suit upon the gambling contracts, if they be such, involved in the controversy. These have been settled, and the losses paid by Kirkpatrick & Co., who are suing for the moneys advanced to pay these losses and their commissions as factors. There can be no question on the facts of this case that they were requested to advance the money by the defendants, and that they have performed the services entitling them to commissions, if you find in the end that there was no gambling in the business. But Kirkpatrick & Co. claim that although Adams & Son may have been gambling with divers and sundry persons to this court and jury wholly unknown, they are entitled to recover their advances notwithstanding. There may be, and often are, circumstances when a commission merchant or other agent, having full knowledge that his customer has been engaged in the illegal business of gambling in the fluctuations of price of a commodity, may recover for his advances to pay the losses. But we need not here stop to inquire about those circumstances, because whatever may have been the precise, legal character of the defendants' dealings, Kirkpatrick & Co. had not only knowledge, but were active participants in them. They knew vastly more about them than the defendants did, and were far more active in the matter than the defendants were. If Adams & Son were gambling with Kirkpatrick & Co.'s money, the latter knew all about it, assented to it, advanced it for the purpose, and willingly played the game for their principals. There cannot be a doubt of this on the proof, and we may dismiss that contention from the case. The plaintiffs cannot recover unless the defendants and the unknown persons from whom they bought, and to whom they sold, under the guidance of the plaintiffs, were engaged in legitimate trade.

*Second.* There has been some contention about the knowledge Adams & Son had of the cotton exchange rules and customs,—not in reference to any supposed defense arising out of the clearing-house usage of settling the contract,—for neither in the proof nor argument has any such defense been suggested as that, by the clearing-house arrangements, Kirkpatrick & Co. were dealing inconsistently or in hostility to their relation as agent for Adams & Son, and the court will therefore assume that the incidental mention of the clearing-house usage has no effect on the case, and that Kirkpatrick & Co. closed out the contracts directly with the parties with whom they were made.

But Adams & Son claim that, because they knew nothing of the rules of the cotton exchange in the matter of the forms, covenants, or stipulations

contained in the contracts given in evidence, they are in no sense bound by them. They say they were dealing in "futures," employed Kirkpatrick & Co. to place them, and that if they chose to operate under the rules of the cotton exchange that was their affair, and the rules cannot be invoked to bind them or aid as evidence in determining the real intention of the parties as to the character of the contract. There is considerable force in this, as there is in the other argument made in behalf of defendants based upon it, that whatever Kirkpatrick & Co. were doing in New Orleans, with the unknown people with whom they were trading, in behalf of Adams & Son, they themselves knew Adams & Son were gambling in "futures;" that Adams & Son had no other intention than to so gamble, and therefore they were not authorized to make any but gambling contracts for Adams & Son, and if, under the rules or otherwise, they made legitimate contracts they exceeded their authority as agents. In other words, defendants say: We employed you to do our gambling for us and not to bind us to valid contracts for the sale and future delivery of cotton.

Forcible as this is, the court does not think it founded on any proof before the jury, or that it is proper to submit it as a possible or fair inference the jury might, on their responsibility, make from the facts disputed or undisputed. It is apparent from the proof that Adams & Son gave no specific directions to their agents. They did not tell them in terms to do anything; their orders were, "buy us one April," etc. What was in their own minds as to this order may have been one thing, and what was understood by Kirkpatrick & Co. may have been another. The law presumes it was an order to do a legal thing, not an illegal thing, and Kirkpatrick & Co. had, in the absence of specific directions, a right to assume that it meant a legitimate transaction, if there were any to which it could apply, and not an illegal one. Moreover, while Adams & Son may have had, and did, perhaps, have, a very confused notion of the details of dealing in "futures," they employed these agents to do their dealing in the most general way possible. The agents were familiar with the business in hand, and were employed because of their familiarity. Adams & Son could scarcely have done the business without a broker; they knew very well that brokers deal according to customs and usages in their business, whether these customs and usages come from the general law or are established by the course of dealing in the market through rules made by the brokers themselves or otherwise. These brokers were employed as such to deal for Adams & Son in the market of the brokers, and, in the absence of specific instructions, they were agents authorized to use their own discretion about the business, and Adams & Son are bound, by the legal contracts made for them, as long as the discretion of the agents is exercised within the scope of their instructions and was reasonable. Their orders were simply to buy or sell for future delivery, and, in doing this, it was their privilege to follow the usages of their business, whether established by the rules of the cotton exchange or in some other way. As between them and Adams & Son, it was a usage of their own. They were the rules of dealing between a broker and his customer, and, when limited to their dealings with each other, as it is in this case, the inquiry about the extent of the agent's authority in making the particular contract is in no way dependent on the principal's knowledge of the usage or rules. Kirkpatrick & Co. were employed by Adams & Son to make contracts for them in the market at New Orleans, not according to the knowledge of Adams & Son about the business, but according to the knowledge and skill of Kirkpatrick & Co. about that business; and our inquiry here about the character of the contracts, in respect to their being lawful or gambling contracts, is limited strictly to the facts and circumstances entering into the dealings between Kirkpatrick & Co. and the unknown persons with whom they made the contracts. It is not the intention of Adams & Son about which we are to inquire, but of

Kirkpatrick & Co., their agents, who made the contracts under the broadest authority, and without specific instructions as to details and the unknown persons with whom they dealt.

We come now to the chief and only important question of controversy between the parties, and it is one of fact, gentlemen of the jury, for you alone to determine. All the court can do is to direct your minds to the principles of law involved in its determination, and it is for you to weigh the proof in all its bearings and decide whether or not Kirkpatrick & Co., the agents of the defendants, and the unknown persons with whom they made the contracts, intended in those particular instances to sell and buy cotton as a commodity to be delivered by the seller to the buyer at a time agreed upon in the future, or only to speculate in the fluctuations of the market, using imaginary and wholly mythical bales of cotton as a basis of the speculation. If they bought and sold in good faith, for actual delivery, they had a right to do all they did; but if they did not intend to buy and sell for actual delivery it was a gambling transaction, void *in toto*, and the defendants are in no way liable to pay this account. It is not sufficient that the parties reserved to themselves an option of converting the contracts into a real transaction of buying and selling for actual delivery if the original intention was to make a contract which contemplated in fact no delivery, but a mere adjustment of differences in prices. It would be none the less a gambling transaction if such was the original purpose, because of the option. And, on the other hand, if the original purpose was to actually deliver the cotton at the time named in the contract, the fact that the parties agreed not to deliver, but to settle on a basis of difference in prices, does not make it a gambling transaction. The existence of the option in the contract is merely one element of fact to which you may look, with all the others, in arriving at the real *bona fide* intention of the parties. And so of the whole contract and all its stipulations. You are not confined to its terms in deciding the question of intention. It may be fair enough on its face and express all the purposes of a fair transaction, and present all the features of a genuine contract to buy and sell actual cotton, yet if you can see from the proof in the case that it was not a genuine contract to buy and sell actual cotton, but a contract to use the simulation of a genuine contract for actual cotton as a real contract for mere speculation in prices, the plaintiffs cannot recover. Every contract to speculate in prices must be necessarily, in form, a contract of buying and selling, unless it is a mere bet in the usual form that on a certain day cotton will be such a price. It is not merely this kind of wagers or bets that the law condemns as gambling. It denounces all transactions that are not genuine contracts to buy and sell the actual commodity as mere gambling. Everybody has a right to speculate in prices if he does it through *bona fide* contracts for actual sale and delivery of the commodity, but no one has a right to speculate through mere imaginary buying and selling in which the parties do not intend in fact to transfer the commodity, but only to meet together and pay the difference. You will see then how plain and simple your inquiry is in this case. It narrows itself down to the one question, of intention of the parties; and the real facts of the transactions, whatever their form, are the subject of your inquiry. Did Kirkpatrick & Co. and the unknown persons in making these contracts really intend to buy and sell actual cotton, or did they merely intend to settle the profits or losses without any actual buying and selling? If you find the contracts were for actual cotton to be delivered according to the stipulations, your verdict must be for the plaintiffs; if they were not contracts for actual delivery, you must find for the defendants.

A good deal has been said about the burden of proof; it is a very simple matter. The law does not presume that these contracts were either valid or invalid, and you are to determine that question from the facts as you find them in the case. The law does presume, in the absence of all proof to the

contrary, that men do not violate the law or its policy, and that in their deal- ings with each other they comply with the law and its policy, and intend to obey it. But this is all. The plaintiffs must show that the defendants owe them money according to their declaration in the case. The law does not presume the money is due because there have been dealings between them; and if, from the nature and character of the dealings the plaintiffs rely on to show the indebtedness, you can see that those dealings were illegal and con- trary to law, there can be no recovery. In the absence of proof of illegality you are to assume them to be legal, and, the defendants having set up the al- leged illegality by their plea, your inquiry is, does the proof show that the contracts were legal or illegal? If no satisfactory proof of facts making them illegal is given, you follow the presumption of legality; but if there be proof of illegality, you take the whole testimony into consideration as in all other cases, and decide according to its weight and value.

Much has been said about the character of this defense calculated to preju- dice the defendants by appealing to that natural repugnance which all men feel toward those who plead the "baby act," the "gambling act," the "usury act," etc. There is a pretty general sentiment that a man who is willing to pocket the profits of illegal dealings should manfully pay the losses. It finds an expression in the maxim that "there is honor among thieves;" but when a man is found who does not recognize the code which demands a compliance with the rules of that honor which prevails among gamblers, and he appeals to the Code of Tennessee and rejects the gambler's "code," courts and juries must enforce the Code of Tennessee and have no jurisdiction of the other. The law encourages men to make the defense, and you should abolish all prejudice against it and decide the issue in this case according to law, with- out partiality, prejudice, fear, or favor from any source. I know you will do this.

The jury rendered a verdict for $1,493.83, the amount sued for by plaintiffs.

Motion for new trial.

*Geo. Gantt* and *Spl. Hill,* for plaintiffs.

*W. W. Murray* and *J. R. Hawkins,* for defendants.

HAMMOND, J., (*orally.*) The motion must be overruled. The case was submitted fairly to the jury, and their is evidence to sustain their verdict. It may be that if the case had been tried by the court alone a different result would have been reached, or, if the judge of the court had been one of the jury, he might have drawn different infer- ences from the facts, and insisted on a different verdict. But it would be a mere usurpation of the functions of a jury for the court to set aside the verdict because it might or would have given a different one.

The trial by jury is a constitutional right of the parties, and this means the concurrent judgment of 12 men, on questions of fact, and not the single judgment of the judge of the court, who cannot lawfully set aside verdicts until one is procured in accordance with his own judgment of the facts. This court is committed to this view of the law by several reported opinions, and its almost invariable practice not to disturb verdicts on the ground that they were contrary to the judge's opinion of the weight of the evidence. The power to do this in a proper case is not denied; but, under our practice, where the par-

ties desire to try the facts by the court, they may so stipulate and take its judgment; or where the court, on a motion for a new trial, would not be satisfied to let a verdict stand, it should direct a verdict for the proper party. It is only where the jury has been misled, misinstructed, or so plainly acts from prejudice, passion, or other unknown influence that the court can see that their verdict must be the product of some such influence, and not a deliberate judgment on the evidence, that it should be set aside. It should not, in my judgment, be set at naught simply because the judge does not like it or has a different notion from the jury as to the weight of the evidence. The line is difficult to draw, but the leading consideration is the preservation of trial by jury and a care not to usurp their function while protecting the parties from partial, improper, or corrupt verdicts. The jury should decide the facts, and parties who go before it should cheerfully submit to their decision, and not experiment, first with the jury, and then with the court if the jury decides adversely. There must be an end somewhere, and this jury may as well end this case as another.

The law was charged strictly according to the adjudged cases of *Irwin* v. *Williar*, 4 Sup. Ct. Rep. 160, (to appear in 110 U. S. 499,) and *Marshall* v. *Thruston*, 3 Lea, 740, and very favorably to defendants. Both sides seemed contented, and neither made exceptions to the charge. Since the verdict it has been subjected to a searching scrutiny, as is proper, to find some error. The court does not see that the jury could have been misled by it. If the court had directed a verdict for the plaintiffs there would have been great complaint by defendants, and if for defendants alike complaint by plaintiffs, and justly so, for it is a clear case for the jury to determine.

It is as plain to the court as a mathematical demonstration that there is no foundation for the objection that the court eliminated from the consideration of the jury the intention of Adams & Son to gamble in prices. Both sides argued the case, and tried it from first to last, on the question whether the contracts out of which the controversy arises were gambling contracts or not. Here are contracts A, B, and C, etc., each for 100 bales of cotton, and the contention is that they were not contracts for actual delivery, but for mere speculation in differences. Now, Adams & Son did not, in fact, make these contracts; they were hundreds of miles away, had no dealings with the other contracting parties, and were ignorant of all the details of the transactions. How, then, can *their* intention enter into the determination of the question whether they were gambling contracts or not? They employed an agent to make the contracts, without specific instructions about the details; and, in testing the legality of the contracts, we must necessarily inquire about the intention of the agent and the other parties. The principal may have intended to gamble, to pocket the profits and repudiate the losses, but if the agent was not engaged in the gambling business, and supposed his princi-

pal was willing to speculate for future prices in a lawful way, the principal cannot, on the facts of this case, defend against the agent's advances on the theory that *he* was only gambling. The court is satisfied with the charge in that respect, and its treatment of that subject. Kirkpatrick & Co. were employed to do the dealing in "futures," and there were no restrictions on their discretion and no instructions to them. Hence they might bind their principals to legitimate dealings as well as imperil their advances by gambling. There might be some force in saying that they were not authorized to bind the principals except by lawful dealings, and therefore the principals were not liable for the losses by illegal gambling transactions; but it is a strange doctrine that, being uninstructed and unrestricted, the agent must lose his advances in lawful dealings because his principal intended to violate the law against gambling and supposed he was doing this.

Overrule the motion.