NORTHWESTERN MUT. LIFE INS. Co. *v.* ELLIOTT and others.

*(Circuit Court, D. Oregon.    December 29, 1880.)*

**1.** CONTRACT, WHERE MADE.—A policy was issued from the office of the plaintiff, in Milwaukee, Wisconsin, upon the life of M. E., in Portland, Oregon, and forwarded to the local agent there for delivery, containing a clause to the effect that the policy was not binding upon the company until countersigned and delivered there and the premium paid accordingly.   *Held,* that the contract was completed in Oregon, that its validity must be determined by the laws of Oregon, and that the plaintiff being then prohibited from doing business in Oregon, the contract was null and void.

**2.** MONEY OBTAINED BY FRAUD.—J. E., the assignee of the aforesaid policy, obtained from the plaintiff thereon the sum of $7,931.97 upon the false and fraudulent representation that the assured was dead.  *Held,* that, nothwithstanding the illegality of the contract of insurance, the plaintiff might maintain a suit against J. E. to obtain the money so fraudulently obtained by him.

**3.** CITIZEN OF ANOTHER STATE—RIGHT TO SUE IN THE NATIONAL COURT. A prohibition by a state that a corporation of another state shall not do business therein, does not prevent such corporation from suing in a national court in the former state, because a state cannot prevent a foreign corporation from suing in such tribunal.

In Equity.

*E. E. Shattuck* and *Julius Moreland,* for plaintiff.

*Addison C. Gibbs* and *Edward Bingham,* for defendants.

DEADY, D. J.    On October 19, 1870, the plaintiff, at its office in Milwaukee, Wisconsin, issued a policy of insurance on the life of Moses Elliot for his own benefit, in the sum of $8,000, and on November 29th of the same year said Moses assigned the same to his father, Jeremiah Elliott; and afterwards, on October 1, 1873, the plaintiff, upon the representation of said Jeremiah that Moses was drowned on June 24, 1871, paid said policy to the former.

On September 30, 1879, this suit was brought to recover this money as having been obtained from the plaintiff by means of the false and fraudulent representations of the father that the son was dead, when in truth and in fact he was living, and to that end to subject certain property alleged to have been purchased by the former with the money so obtained of the plaintiff to the satisfaction of any decree

which may be herein obtained against him, to-wit: a band of sheep containing several hundred head, and now in the possession of the defendants Jeremiah, James Madison, and Albert Elliott, and Frank Williams, *alias* Moses Elliott; and donation claims situate in Jackson county and numbered 62 and 83, and containing 320.10 and 319.98 acres respectively, and by said Jeremiah, on November 11, and December 22, 1872, procured to be conveyed to the defendant Arty Mesy, his wife, with intent to hinder and defraud the plaintiff, 100 acres of which was afterwards conveyed to the defendant Albert Elliott, without consideration and with the like intent.

The bill states that the defendants, except Deardoff, are citizens of Oregon, and that he has gone to parts unknown, and prays that if he comes within the jurisdiction he may be made a party if necessary; that the defendant Frank Williams is in fact Moses Elliott, and that the plaintiff did not discover the alleged fraud until within 18 months prior to the commencement of this suit. Only Jeremiah Elliott and wife, and James Madison Elliott, were found within the jurisdiction and served with a subpœna to answer. The defendant James Madison Elliott answers, disclaiming any interest in the sheep or real property, except a leasehold interest, which will terminate on October 31, 1881, in donation No. 82, jointly with his brother Marion Elliott, for which they pay Arty Mesy one-third of the crop.

The defendant Jeremiah and his wife answer jointly, admitting that in 1870 the plaintiff, by its agent, resident in Oregon, O. B. Gibson, insured the life of their son, Moses Elliott, for $8,000, and that said Moses soon after assigned and transferred the policy therefor to the defendant Jeremiah, but aver that said policy was null and void, because the plaintiff was not then authorized or qualified to do business in Oregon; that on June 24, 1871, said Moses was drowned in the Columbia river, and that in consequence of the claim and representations to that effect, contained in the affidavits of said Jeremiah and Deardoff, the plaintiff at Portland, Oregon, on October 1, 1873, paid said Jeremiah, as the assignee of said Moses, on account of his policy and death, $7,931.97;

that no part of the property aforesaid was purchased with said money, but that said real property was purchased with the funds of said Arty Mesy derived from her father's estate 25 years ago, and the interest thereon, amounting to $2,300, and that said Albert Elliott paid about $800 for the 100 acres thereof subsequently conveyed to him.

The defence that the contract and policy of insurance is void is founded upon the statute of Oregon, (Or. Laws, 617, Oct. 24, 1864,) providing that "a foreign corporation, before transacting business in this state, must duly" appoint an attorney resident here, upon whom service of process may be made in all proceedings brought against it within the state.

*In re Comstock*, 3 Sawy. 218, and in *Semple* v. *The Bank of B. C.* 5 Sawy. 88, this court held that a foreign corporation, before complying with this act, is not authorized to transact business in Oregon, and that any act done therein by such corporation, before the appointment of such resident attorney, is null and void; and to the same effect is the decision of the supreme court of the state in *Bank of B. C.* v. *Page*, 6 Or. 431.

In reply to this the plaintiff contends that the contract of insurance was not made in Oregon, but in Wisconsin, and is therefore valid notwithstanding the Oregon statute. The facts bearing upon this question appear to be that the application for the policy was made at Portland, Oregon, on September 22, 1870, to O. B. Gibson, the agent of the plaintiff, then resident here, who then stated thereon that the "renewals" were to be made at the Portland agency, and was by him forwarded to the plaintiff, who, on October 19, 1870, at Milwaukee, Wisconsin, forwarded the policy, signed by its president and secretary, to said Gibson at Portland, Oregon, who then delivered the same to the insured, and received from him the first quarterly premium of $26 cash, and $39.28 in his note. The policy contains this clause: "*Seventh.* This policy shall not take effect and become binding on the company until the premium shall be actually paid during the life-time of the person whose life is assured, to the company or some person authorized to receive it, who shall countersign the policy on receipt of the premium."

The policy is "countersigned by O. B. Gibson, agent."

Generally speaking, the validity of a contract is to be decided by the law of the place where it is made, and if valid or void there, it is valid or void everywhere. The few exceptions to this rule need not be mentioned in the application of it to this case. Story's Con. Laws, § 242 (1) *et seq.*; Cooley's Con. Lim. 286; *Cox* v. *U. S.* 6 Pet. 203; *Hyde* v. *Goodnow*, 3 N. Y. 269; *In re Clifford*, 2 Sawy. 428. Where, then, was this contract made: in Wisconsin or Oregon? The answer to this question involves the inquiry, where did the final act take place which made the transaction a contract binding upon the parties.

The premium was paid to the agent of the plaintiff at Portland, who then and there countersigned and delivered the policy. This was the consummation and completion of the contract. But, to put this beyond a doubt, the policy itself declares that it shall not be binding on the company until these acts are performed. And, until it was binding upon the company, it was not binding on the applicant; in short, it was not yet a contract, but only a proposition. *Pomeroy* v. *Manhattan L. Ins. Co.* 40 Ill. 400; *Thwing* v. *Great Western Ins. Co.* 111 Mass. 109; Wood F. Ins. 189 and n. 2; *Hardie* v. *St. Louis M. L. Ins. Co.* 26 La. An. 242; *St. Louis M. L. Ins. Co.* v. *Kennedy*, 6 Bush, 450.

The case of *Hyde* v. *Goodnow, supra*, cited by counsel for plaintiff, is not contrary to this conclusion. There the assured, living in Ohio, applied to a company in New York, through its local agent and surveyor, for insurance, sending with his application a premium note and the report of the surveyor thereon. The company accepted the application in New York and mailed the policy direct to the applicant in Ohio, which, in accordance with its by-law, contained the stipulation that it should not be binding until the application and premium note were deposited in the office of the company and approved by its directors. The contract, if made in Ohio, was illegal and void, because the company was not authorized to transact business there; but, in a suit upon the premium note against the maker in New York, the court

held that the contract was made in the latter state and therefore valid, because, when the application was approved and the policy deposited in the mail at New York, addressed to the defendant, the contract was then and thereby executed, and became binding on the parties thereto.

An offer by mail to insure certain property, and an acceptance by letter of the proposition, constitute a valid contract at and from the place and date of mailing such letter of acceptance. *Tayloe* v. *The Merchants' F. Ins. Co.* 9 How. 398.

But, admitting that the contract of insurance in this case was made in Oregon and is therefore illegal and void, the plaintiff contends that it is entitled to the relief sought upon the ground that the defendant Jeremiah obtained money from it to which he was not entitled, by means of the false and fraudulent representations concerning the death of Moses Elliott. In answer to this proposition the defendant insists that this suit, if not brought directly upon the illegal contract of insurance, is brought upon an implied one, to the effect that the defendant would return the money thus obtained from the plaintiff; and that such implied contract arises immediately out of and is connected with the original illegal one, and is therefore illegal itself, citing *McCausland* v. *Ralston,* 12 Nev. 195; *McBlair* v. *Gibbes,* 17 How. 233; *Armstrong* v. *Toler,* 11 Wheat. 258; *Dillon* v. *Allen,* 46 Iowa, 299. But it is a mistake to suppose this suit is brought upon a contract actually made or attempted to be made by the parties, and within the purview or operation of the prohibition of the statute, or at all. On the contrary, it is a suit brought to recover money obtained by the defendant from the plaintiff, not upon the void contract of insurance, but the fraud of the defendant. True, the plaintiff might at common law, upon the facts, have maintained *assumpsit* for money had and received by the defendant to the plaintiff's use, and the law, in the interest of justice and by way of promoting the remedy, which was in form *ex contractu,* would have implied a promise on the part of the defendant to pay. But this would not have been a contract arising out of the void and illegal one, nor in any respect an affirmance of its validity, but only an implica-

tion or fiction of law that upon the facts—the plaintiff being entitled *ex æquo et bono* to recover the money which the defendant had wrongly obtained from it—he promised to repay the same.

The case of *Catts* v. *Phalen*, 2 How. 376, is directly in point and decisive of the one at bar upon this question. In it the supreme court held that when a person was employed to draw an illegal lottery, and secretly procured a ticket therein, to be purchased in the name of another for himself, and thereafter fraudulently pretended that such ticket drew a prize of $15,000, which was paid by the proprietors in ignorance of the fraud, that they might maintain an action against the drawer to recover the amount so fraudulently obtained.

In delivering the opinion of the court, Mr. Justice Baldwin said: "The facts of the case present a scene of deeply-concocted, deliberate, gross, and most wicked fraud, which the defendant neither attempted to disprove nor mitigate at the trial, the consequence of which is that he has not, and cannot have, any better standing in court than if he had never owned a ticket in the lottery, or it had never been drawn. So far as he is concerned, the law annuls the pretended drawing of the prize he claimed; and, in point of law, he did not draw the lottery. His fraud avoids not only his acts, but places him in the same position as if there had been no drawing in fact, and he had claimed and received the money of the plaintiffs by means of any other false pretense, and he is estopped from avowing that the lottery was in fact drawn. * * * The transaction between the parties did not originate in the drawing of an illegal lottery; the money was not paid on a ticket which was entitled to or drew the prize. It was paid and received on the false assertion of the fact. The contract which the law raises between them is not founded on the drawing of the lottery, but on the obligation to refund the money which has been received by falsehood and fraud, by the assertion of a drawing which never took place. To state is to decide such a case."

So, here, assuming, as this defence admits, that this money

was obtained from the plaintiff as alleged in the bill, the trust or contract which the law raises or implies between the parties is not founded on the illegal contract of insurance, but on the obligation of the defendant to refund the money which he obtained from the plaintiff by falsehood and fraud, by the assertion and representation of a death which never took place. To state such a case is to decide it also. Indeed, it appears to me that if the defendant had robbed the agent of the plaintiff in this state of this money on the highway, he might with as good grace defend an action to recover the stolen property, on the ground that the plaintiff was not authorized to do business in this state, as in the present case. Although the defendant was not authorized to do an insurance business in this state, this fact did not license the defendant to rob or defraud it under pretence of doing such business with it.

The answer also makes the objection that the plaintiff is not capable of suing in this state, because, as alleged, it has not yet properly complied with the laws of this state authorizing it to do business here. But without stopping to consider whether this objection should not have been taken by plea in abatement, or what is the effect of the proof upon the point, it is sufficient to say that the plaintiff, being a citizen of Wisconsin, may sue in this court whether it is authorized to do business in the state or not. The state cannot deprive a citizen of another state of the right to sue in the national court, nor has it attempted to do so. The "business" which a foreign insurance company is prohibited from doing in this state, before complying with its laws, is the business of insurance, and not the bringing or maintaining a suit in this court.

It only remains to dispose of the question of fact: Did Jeremiah Elliott obtain this money from the plaintiff by means of false representations as to the death of Moses, as alleged in the bill? The joint answer of Jeremiah and Arty Mesy, his wife, denies the allegations of the bill in this respect; but, while Jeremiah was examined as a witness on his own behalf before the examiner, the wife was not produced. The reason for this omission is left to be inferred from the circumstances, but it is not improbable that the wife might verify an answer

before a notary, with her husband, that she could not or would not support in detail upon a cross-examination by counsel before the examiner. Besides, there are three sons of the defendant Jeremiah—Madison, Marion, and Andrew—and one daughter, Mary Ann, who ought to be material witnesses in this case, and have not been called or examined by him; and the first of these, Madison, is a defendant in this suit, who has answered, simply denying the fraud "as to himself."

The evidence taken is quite voluminous, and in some material particulars conflicting and unsatisfactory. But the weight and direction of all the evident and controlling circumstances in the case tend strongly to the conclusion that the money was obtained from the plaintiff by fraud; that Moses Elliott was not drowned in the Columbia, but at the commencement of this suit was still alive and practically living with the Elliotts, under the assumed name of Frank Williams.

It is admitted, or satisfactorily appears from the evidence, that in September, 1869, Moses Elliott came from Iowa to the Pacific coast, and that in June, 1870, the father and mother, with their children, Madison, Marion, Andrew, Eldora, and Mary Ann, came to Portland direct from Iowa, and that Moses was either here at the time or came with them from Nevada. The father and sons got employment at the Eagle Cliff cannery, on the lower Columbia, and in the fall the family moved to Columbia county, Oregon, near Westport, where Jeremiah took up a quarter section of land under the pre-emption law, upon which he lived until his removal to Jackson county in the fall of 1873. W. H. Deardoff, a half-brother of Arty Mesy's, and who came to Oregon sometime before the Elliotts, lived with them. The house was a small cabin of two rooms, built of old, round logs, and contained very little furniture, and that of no value. Neither the father nor the sons appear to have had any special trade or vocation. Moses worked some in the cannery, and getting out piles and stave timber, but preferred hunting, to which he was much addicted. The mother took in washing, and to all appearances they were very poor, living from hand to mouth, and so represented themselves to the neighbors.

At the time the insurance was effected with the plaintiff on the life of Moses, he was a poor, illiterate youth of 18 or 20 years of age, without any one specially dependent upon or interested in his life, and without any particular means of making money enough to support himself and pay a yearly cash premium of $104, which he might reasonably expect to do for the next 40 years, and for the benefit of he knew not whom. At the same time he had a 10-year endowment policy in the Union Mutual, of Maine, upon which the yearly premium was $217, and which was countersigned and probably delivered at Chicago, Illinois, on August 30, 1869, thus making the yearly premiums which Moses undertook to pay $324. It is also morally certain that this insurance upon the life of Moses, although obtained in his own name and apparently for his benefit, was really procured and carried by the father, and intended for his use and benefit. It appears he was present when the application was made to Gibson, and evidently conducted the negotiation, and within a short time after the policy was received, without any consideration or excuse therefor, assigned it to himself, "for his sole use and benefit"—signing the name of the assured to the assignment as if the instrument was his own, and the boy's name had been merely used in the transaction as a convenience or make-believe.

The defendant Jeremiah alleges that on June 24, 1871, Moses Elliott, while assisting his uncle, W. H. Deardoff, with a raft on the Columbia river, a few miles below Westport, fell into the river and was drowned; that no person witnessed the circumstance except said Deardoff, and he reported the fact to the defendant, who searched for his body but was unable to find it. The plaintiff alleges that this story is a falsehood, devised by the defendant to enable him to fraudulently collect the insurance on Moses' life.

It appears from the evidence that Jeremiah, after procuring the payment of the insurance on Moses' life, in the fall of 1873, went to Jackson county, Oregon, where he purchased the real property and sheep mentioned in the bill with a portion of said money, and before the close of the year removed

his family there, where he has ever since resided; that soon after Moses Elliott made his appearance in that country under the assumed name of Frank Williams, where, at first, he kept in the mountains and followed hunting, but after a time herded sheep with and for the Elliotts in the mountain ranges, and lived with them in the settlement much of the time, claiming to be a cousin of the Elliott boys, and was at the house of Jeremiah on the night of October 20, 1879, when the process in this case was served on the latter; that he left the neighborhood the next day, with the knowledge of Jeremiah, and has not been seen or heard of since.

There is conflicting evidence as to the identity of Moses Elliott and Frank Williams, but that which denies it is from some of the Elliotts and persons who never saw Moses before he was said to have been drowned. The circumstance most relied upon to disprove the identity is a difference in height and beard. But between 1870 and 1875 or 1879, there was, probably, a marked change in both the height and beard of a youth the age of Moses; and nothing is more unreliable than the guess of the average person as to the height of another, particularly when that other is absent or out of sight. It is probable that a person's ordinary acquaintances will, particularly in his absence, differ as much as two inches in estimating his height. From the evidence I conclude that Frank Williams is very near five feet eleven inches high—not to exceed that. The defendant Jeremiah, in his affidavit of October 11, 1872, says he thinks that Moses was five feet nine inches high "at the time of his insurance," in the fall of 1870. Between then and 1879 or 1875 it is probable that he grew an inch, and the other inch, or part of a one, may be fairly accounted for by the ordinary difference in estimates of height. But there is a circumstance in favor of the identity of the persons, about which there is no doubt, that outweighs all such supposed differences in height and beard. Moses Elliott has lost the two middle fingers of his right hand just below the middle joint, and so has Williams. Those of the former were cut off when he was a mere child, by a hatchet in the hands of his brother, and the appearance of Williams' hand shows

plainly that he lost his in early life.   It may be possible to find two men in the world thus similarly marked, but barely so; and the fact is sufficient, in the absence of any well-established and controlling circumstance to the contrary, to establish identity.   If, notwithstanding the similar loss of the fingers, it satisfactorily appeared that Frank had coal-black hair and eyes, while Moses had bright red hair and blue eyes, then the evidence of identity from this fact would be overcome, for it is even more probable that two men should be so similarly wounded in the hand, than that the same person should have red hair and blue eyes in 1870, and black hair and eyes in 1875 or 1879.   But there is no such contradictory and controlling circumstance in this case.   On the contrary, every particle of the evidence entitled to credence points with more or less directness and certainty to the conclusion that Moses Elliott and Frank Williams are one and the same person.

Again, there is the direct and positive testimony of John Dunn.   He is a disinterested witness, and his position and employment indicate that he is reliable.   He worked in the Eagle Cliff cannery in 1870, when Moses Elliott was there, and has been foreman of the establishment for the past four years.   He says he worked in the same cannery with Moses for a month or more, and during that time ate at the same table and slept in the same house with him.   In October, 1879, at the request of the agent of the plaintiff, he went with Mr. Neill, the prosecuting attorney of Jackson county, to the cabin of the sheep ranch where Frank Williams was staying; saw him, and heard Neill talk with him, and he swears unqualifiedly that he is the Moses Elliott whom he knew at the cannery.

But the failure of Jeremiah to produce the best evidence upon this point, or to account for not doing so, is a circumstance that warrants the inference that such evidence would have been in favor of the identity.   W. H. Deardoff is the half-brother of Arty Mesy, and is the only witness of the alleged drowning of Moses.   He came to Oregon two years before the Elliotts, and lived with them in Columbia county

at least until 1872. He was present when Gibson was applied to for the insurance on Moses' life, and seems to have taken some interest in the transaction. He knows, if any one does, whether Moses was drowned or not, and whether Frank Williams is his *alias* or not. Frank Williams lived with and about the defendant for years before the commencement of this suit. His testimony upon the subject of his identity, and particularly an inspection of his person, would be very material in this case.

Why are not these persons examined as witnesses, or the failure to do so accounted for? They are the relatives and friends of the defendant, and may reasonably be supposed to be within his control or knowledge, and willing to assist him if they could. The reasonable inference is that the defendant dared not call them, and that in the case of Williams he sent the witness out of the country as soon as he was aware of the commencement of the suit. Neither is Madison Elliott called. He is the son of the defendant and lives near him, and ought to be able to state whether Frank Williams is Moses Elliott or not, and the inference is that the defendant knew or thought he would not testify against their identity, and therefore did not examine him. So with the mother, Arty Mesy Elliott; she knows whether Frank Williams is the child she bore and "called his name Moses" or not; and although she has, in the joint answer of herself and husband, affirmed in effect that they are not identical, I cannot but think that if such was the fact she would have been examined as a witness upon that point, and given an opportunity to say so explicitly, subject to cross-examination.

By way of preventing the real property mentioned in the bill from being taken to satisfy any decree which the plaintiff may obtain in this case, the defendant Jeremiah has set up and testified to a story to the effect that this property was bought with the separate funds of his wife. In brief, it is this: That Jeremiah and Arty Mesy were married in Ohio in 1843, and in 1857 the latter received from her father's estate $1,500, which in 1858 they converted into gold and carried with them to Iowa, where they kept it until the advent of greenbacks,

when they exchanged the gold for the latter and then invested these in 5-20's, so as to swell the amount to $2,500; that in 1870 they brought $2,300 of these bonds to San Francisco, where they exchanged them at par for gold and brought the gold to Oregon, where they kept it "under lock and key, in an elk-skin purse," until the fall of 1873, when the defendant purchased this property with $2,025 of this money, and took the conveyances therefor to his wife.

In the light of the established circumstances of the case the story is a very improbable one, and the contradictions and absurdities with which Jeremiah Elliott has filled his testimony, in the attempt to support it, make it utterly unworthy of belief.

When the plaintiff paid him with a check on New York, he gave the same to the National Bank of this city for collection, but apparently he was in such urgent need of money that he could not wait from the first to the eighteenth of the month, when the collection was telegraphed, but got $600 on interest from the bank on the security of the check, and yet he testifies that at that very time his wife had $2,300 in gold lying idle, and he had $950 of his own in bonds. In the language of the court, in *Catts* v. *Phelan, supra,* this transaction seems to have been, on the part of Jeremiah Elliott, "a deeply-concocted, deliberate, gross, and most wicked fraud."

There must be a decree that the plaintiff recover of the defendant Jeremiah the sum of $7,931.97, with legal interest from October 1, 1873, together with costs, and that the property mentioned in the bill be held by the parties claiming it in trust for the plaintiff, and that the same be sold to satisfy this decree.