BERRY *et al. v.* KNIGHTS TEMPLARS' & MASONS' LIFE INDEMNITY CO.

*(Circuit Court, W. D. Missouri.*   May 9, 1891.)

1. FOREIGN LIFE INSURANCE COMPANY—LEX LOCI CONTRACTUS—STIPULATION AGAINST SUICIDE—VALIDITY.

A life insurance company chartered in the state of Illinois carried on its business in the state of Missouri through agents appointed for that purpose.   The method of doing business was this:   The agent in Missouri would solicit and receive from citizens of that state applications for insurance, which he would forward to the home office of the company at Chicago.   When an application was approved, a policy was filled up, dated, and signed by the officers of the company at Chicago, transmitted by mail to the agent of the company in Missouri, who, upon the ment to him by the applicant of the first premium, called in this case an "entry fee," delivered the policy to the assured.   Upon these facts, *held:* (1) T company was "doing business" in the state of Missouri within the meaning of words in section 5982 of the Revised Statutes of that state; (2) that the pol a Missouri, and not an Illinois, contract, and that the validity and legal effe stipulations must be determined by the laws of Missouri; (3) that a stipu such a policy that "in case of the self-destruction of the holder of thi whether voluntary or involuntary, sane or insane, * * * this policy come null and void," is void under section 5982 of the Revised Statutes of M which declares such a stipulation in a policy issued by "any company doi ness in this state shall be void;" (4) that the statute is mandatory and and cannot be waived or suspended by convention of the parties, or by an whatsoever.

2. SAME—DOING BUSINESS CONTRARY TO LAW—VALIDITY OF POLICY—ESTOPPEL

If a life insurance company of one state does business in another state w doing those things which the law of the state requires to be done by a for surance company to qualify it to do business therein, the company and it

and agents incur the prescribed penalties, but its policies are binding on the company, and may be enforced by the holder in the same manner and with like effect as if it had qualified itself to do business in the state. In a suit by a policy-holder the company is estopped to deny that it was authorized to do business in the state.

**8. SAME—LIFE INDEMNITY COMPANY.**

"The Knights Templars' & Masons' Life Indemnity Company," a corporation of the state of Illinois, is not "a co-operative benevolent insurance society," nor "a fraternal brotherhood having a community interest,"—whatever these phrases may mean,—but is an incorporated life insurance company on the co-operative or assessment plan, not for mutual benevolence, but for mutual insurance, and as such it comes within the purview of the statutes of the state of Missouri relating to life insurance companies.

At Law.

*George Hall, E. M. Harber,* and *F. H. Bacon,* for plaintiffs.
*Luther Collier* and *Huston & Parrish,* for defendant.

CALDWELL, J. On the 6th day of July, 1885, the defendant, a corporation created under the laws of Illinois and doing business in this state, issued to John B. Berry, then a resident and citizen of this state, a policy of insurance on his life for the sum of $5,000, subject to conditions which will be hereafter noticed. On the 7th day of November, 1889, Berry committed suicide by hanging. The holders of the policy, the present plaintiffs, made due proof of Berry's death, and demanded payment of the policy. The company refused to pay, upon the ground that the policy was void by reason of the following condition contained therein, viz.: "In case of the self-destruction of the holder of this policy, whether voluntary or involuntary, sane or insane, * * * this policy shall become null and void." The plaintiffs thereupon brought this suit to recover the amount of the policy. The company pleads the suicide of the assured, and the above-recited condition of the policy, in bar of the action. The plaintiffs reply that a statute of this state, in force at the date of the policy, renders that provision of it void. The statute reads as follows:

"In all suits upon policies of insurance on life hereafter issued by any company doing business in this state, it shall be no defense that the assured committed suicide, unless it shall be shown to the satisfaction of the court or jury ...ing the cause that the assured contemplated suicide at the time he made ...pplication for the policy, and any stipulation in the policy to the con... shall be void." Section 5982, Rev. St. Mo.

...his statute is applicable to the policy in suit, it puts an end to the ...ny's defense. The defendant contends that it is not applicable for ...reasons.

... is said the policy is an Illinois contract, and to be construed by ... of that state. But clearly this is not so. The company estab... ...n agency, and carried on its business, in this state. It was ... that agency the assured, who was a citizen and resident of the ...ade his application and received his policy. The fact that the ... was signed by the officers of the company in Chicago has no sig... ...ce. It was transmitted to the company's agent in Missouri, who ... the premium, called, in this case, an "entrance fee," and de-

livered the policy to the assured, at his home in this state, and it took effect at that place and from that date. Corporations are artificial creations, and have no natural rights, and their constitutional and legal rights, in some respects, fall short of those of natural persons. A state cannot deny to the citizens of other states the right to do business within its limits, but it may deny such right absolutely to corporations of other states, or may admit them to do business on such terms and conditions as it is pleased to prescribe. And when an insurance company of one state does business in another, the laws of the latter state prescribing the terms and conditions upon which it is allowed to do business in the state are obligatory upon it. These conditions may extend to the form and legal effect of the company's policies, and if, in the course of its business in the state, it issues policies on the lives or on the property of the citizens of the state which contain conditions prohibited by or in contravention of the laws of the state, such conditions are void. Doing business in the state brings the policy within the operation of its laws, notwithstanding the policy may be signed, and the loss made payable, in another state. In such cases the company cannot, by any contrivance or device whatever, evade the effect and operation of the laws of the state where it is doing business. *Wall* v. *Society*, 32 Fed. Rep. 273.

2. It is contended that the provision in the policy, declaring that it shall be void if the assured commits suicide, is a waiver or nullification of the statute which declares such a stipulation in a policy "shall be void." The statute is mandatory and obligatory alike on the insurance company and the assured. Its very object was to prohibit and annul such stipulations in policies, and it cannot be waived or abrogated by any form of contract or by any device whatever. The legislative will, when expressed in the peremptory terms of this statute, is paramount and absolute, and cannot be varied or waived by the private conventions of the parties.

3. The next contention of the defendant is that, although it was doing business in the state at the time the policy was issued, it had not then done those things which by the laws of the state were conditions precedent to its right to do business in the state, and "that, therefore," in the language of its counsel, "the defendant did not in any way submit to the jurisdiction of the state," and is in no manner bound by its laws. The state laws referred to were enacted for the benefit of the state, and the protection of the policy-holders. By failing to comply with them, the defendant and its agents incurred the prescribed penalties; but such failure does not affect the validity of its policies, or in any manner operate to the prejudice of its policy-holders. By the fact of doing business in the state it asserted a compliance with the laws of the state, and, after enjoying all the benefits of that business, and receiving the money of the assured, it will not be heard to say that it never submitted "to the jurisdiction of the state." It can reap no advantage from its own wrong. To sustain this defense would be giving judicial sanction to

business methods much below the standard of common honesty. *Ehrman* v. *Insurance Co.*, 1 Fed. Rep. 471, 1 McCrary, 123; *Fletcher* v. *Insurance Co.*, 13 Fed. Rep. 528, 4 McCrary, 440; *Insurance Co.* v. *Elliott*, 5 Fed. Rep. 225, 7 Sawy. 17; *Wall* v. *Society*, 32 Fed. Rep. 273; *Insurance Co.* v. *McMillen*, 24 Ohio St. 67; *Clay, etc., Ins. Co.* v. *Huron Salt, etc., Co.*, 31 Mich. 346; *Insurance Co.* v. *Walsh*, 18 Mo. 229; *Lamb* v. *Bowser*, 7 Biss. 315, 372; *Insurance Co.* v. *Matthews*, 102 Mass. 221.

4. It is next contended that the defendant is not a life insurance company, and therefore not subject to the laws of the state applicable to life insurance companies, and particularly that section 5982 of the Revised Statutes of the state has no application to its policies. The company is variously styled in the answer and brief of its counsel "a corporation for benevolent purposes," "a fraternal brotherhood, having a community interest," and "a co-operative benevolent insurance society." The defendant was incorporated under the general incorporation laws of the state of Illinois on the 5th day of May, 1884. Its character as a corporation is disclosed by its charter, the policies it issues, and its mode of conducting business. Its charter provides:

### "ARTICLE I.

"Section 1. This company shall be known as the 'Knights Templars' and Masons' Life Indemnity Company.'

"Sec. 2. The object of this company shall be to furnish life indemnity or pecuniary benefits to the widows, orphans, heirs, relatives, devisees, or legatees of deceased members, according to the regulations and provisions hereinafter specified.

"Sec. 3. The principal office of the company shall be at Chicago, Illinois, but the board may establish branch offices elsewhere.

### "ARTICLE II.

"Section 1. The officers of this company shall be a president, vice-president, second vice-president, and medical director, to be chosen annually by the board of directors.

"Sec. 2. The affairs of the corporation shall be managed by not less than five nor more than nine directors, who shall be elected from and by the members. * * *

### "ARTICLE III.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"Sec. 2. The board of directors shall have power to employ any agent, agents, or other service, for such time, and on such terms, and with such powers, as in their judgment will best promote and conserve the interests of the company. * * *

### "ARTICLE IV.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"Sec. 3. Policies of membership may be issued upon a basis of benefits ranging in amounts to five thousand dollars. * * *

"Sec. 4. Upon the death of any member, an assessment, increasing with age, shall be made upon the surviving members, provided an assessment is needed, according to the following table of rates. Said table is drawn for $1,000, which shall be the unit in determining all other amounts:

"*Table of Rates—Assessments per* $1,000.

| Years of age, inclusive, | 21 to 30, | - | - | - | - | - | $0 50 |
|---|---|---|---|---|---|---|---|
| " " " | 31 to 35, | - | - | - | - | | 60 |
| " " " | 36 to 40, | - | - | - | - | - | 65 |
| " " " | 41 to 45, | - | - | - | - | | 80 |
| " " " | 46 to 50, | - | - | - | - | | 95 |
| " " " | 51 to 55, | - | - | - | - | | 1 20 |
| " " " | 56 to 60, | - | - | - | - | | 1 50 |
| " " " | 61 to 65. | - | - | - | - | | 2 00 |
| " " " | 66 and upwards, | - | - | - | - | | 2 55 |

—But no assessment shall be made so long as the money in the death fund will pay the maximum loss in full."

Its sources of revenue are an entrance free of from $6 to $12, depending on the amount of the policy, paid by each member on the acceptance of his application, fixed annual dues, at the rate of $1 dollar for each $1,000 of insurance, and assessments on its members, according to the fixed rule in the charter, to pay death losses.   Three-quarters of the money derived from assessments to pay death losses is placed to the credit of the death fund, to pay policies.   The remaining fourth of the money derived from that source, and all the moneys derived from entrance fees and annual dues, in the language of the charter, constitute "a contingent fund, out of which the expenses and emergencies are to be met."   The policies issued by the company provide that on the death of the assured the policy-holder shall receive the amount of the policy, and the money "paid on the policy in assessments, subject to the limitation, as to the amount of such payment, as provided in section one of article seven" of the charter, which reads as follows:

"A policy of membership for five thousand dollars shall be good for all the money in the death fund arising from one assessment, provided it shall not exceed five thousand dollars and all the money paid on the policy in assessments; and a certificate for four thousand dollars shall be good for four-fifths of all the money in the death fund arising from one assessment, provided it shall not exceed four thousand dollars and all the money paid on the policy in assessments; and so on in the same proportion as to all certificates."

If the money in the death fund arising from one assessment to pay a policy of a given amount is sufficient for that purpose after deducting therefrom 25 per cent. for the "contingent fund," as provided by article 5 of the charter, the full amount of the policy is paid; if not, the policy-holder loses the deficiency, the company, unlike regular mutual companies, having no reserve fund.   If the assured fails to pay promptly his annual dues or assessments, the policy becomes void; and there are numerous other conditions relating to the place of residence, travel, occupation, habits, and the like, of the assured, upon the violation of any one of which the policy is forfeited, being in this and other respects similar to the policies usually issued by life insurance companies.   The manager testifies that the company does business in a good many states, and that the bulk of its business is done by and through agents, who are paid by the company for their services.   Upon the organization of the company by its charter members, it was understood that members of

the Masonic order only should be admitted to membership, and the practice has conformed to that understanding, though there is no provision to that effect in the charter or policy. When the company was incorporated in 1884 there were but six charter members or corporators, each one of whom became a director and officer of the company immediately upon its organization, and has continued to be such from that time down to the taking of the depositions in this case, with the exception of one, who died, and the surviving directors elected a person to fill the vacancy thus created. All the officers and agents of the company enjoy remunerative salaries and commissions; the commissions of the manager amounting, at times, to as much as $1,000 per month. The company has no affiliation, and sustains no official relation or connection, with the Masonic order, or any lodge or body belonging to that order. No Masonic body has the power of visitation, or any other jurisdiction or authority, over it, nor is any Masonic body responsible for the conduct of its business, or its debts or obligations. The Masonic feature of the company is limited to its name, and the restriction of its membership to Masons, and the employment of Masons as its agents. The success of the company attests the wisdom of its founders in this regard in a business point of view. By these means its agents have the *entrée* to Masonic lodges and other Masonic bodies. The advantages accruing from this privilege in the solicitation of membership and business are obvious. There are corporations in which the element of insurance is so mingled with benevolent, charitable, social, or other ends that it is difficult to tell whether they should be classed as insurance companies or benevolent societies. But that difficulty does not arise in this case. It is apparent, from an examination of its charter, and its method of doing business, that the defendant is a mutual life insurance company on the assessment plan. Its business is insurance, and nothing else. There is not a social, charitable, or benevolent feature in its organization, or the conduct of its business. It has no lodges, pays no sick dues, and distributes no aid, and gives no attention, to members in distress or poverty. It deals with its members on the strictest business principles. The policy-holders get nothing for which full value has not been paid by the assured, but the assured may pay much, and the policy-holder receive nothing, by reason of the forfeiture of the policy for a violation of some one of its numerous conditions. It would be a curious sort of benevolence which would withhold from innocent children the insurance effected for their benefit on the life of their father because he committed suicide. But that is the kind of benevolence the defendant wants to practice in this case. The assumption of a Masonic name does not make it a Masonic institution. A popular or captivating name often performs a useful office as a business advertisement, but it goes for nothing in determining the legal character of the corporation adopting it. The law is not to be cheated by any gloss of words. It judges things by what they are in fact, and not by their names.

The learned counsel for the defendant say in their brief that their client manifests its "benevolence by contract, and through contractual

relations, instead of mere voluntary, and therefore uncertain, gifts." That is precisely the kind of benevolence practiced by all insurance companies as long as they continue to pay their honest losses.   The defendant is not "a co-operative benevolent insurance society," nor "a fraternal brotherhood, having a community interest," (whatever these phrases may mean,) but is an incorporated life insurance company on the co-operative or assessment plan, not for mutual benevolence, but for mutual insurance, and as such it comes within the purview of the statutes of this state relating to life insurance companies.   *State* v. *Association*, 6 Mo. App. 171; *State* v. *Critchett*, (Minn.) 32 N. W. Rep. 787; *Farmer* v. *State*, (Tex.) 7 S. W. Rep. 220; *Walter* v. *Society*, (Minn.) 44 N. W. Rep. 57; *McConnell* v. *Association*, (Iowa,) 43 N. W. Rep. 188; *Com.* v. *Association*, (Pa.) 18 Atl. Rep. 1112; *Com.* v. *Wetherbee*, 105 Mass. 149; *Golden Rule* v. *People*, 118 Ill. 492, 9 N. E. Rep. 342; *State* v. *Society*, 72 Mo. 146; *Wall* v. *Society*, 32 Fed. Rep. 276.   The clause in the policy declaring it void in case of the suicide of the assured is itself void under the section of the Revised Statutes heretofore quoted.   Let judgment be entered for the plaintiffs.

NOTE.   Since the opinion in this case was filed, the supreme court of the United States has decided the case of Equitable Life Assurance Soc. v. Pettus. The opinion of the circuit court in that case is reported under the title of Wall v. Society, 32 Fed. Rep. 273.   The supreme court affirmed the judgment of the circuit court, and say: "Upon this record, the conclusion is inevitable that the policy never became a completed contract, binding either party to it, until the delivery of the policy and the payment of the first premium in Missouri; and consequently that the policy is a Missouri contract, and governed by the laws of Missouri."   Referring to the Missouri statute prescribing the rules for the commutation of life policies upon which two full annual premiums had been paid, the court say: "The manifest object of this statute, as of many statutes regulating the form of policies of insurance on lives or against fires, is to prevent insurance companies from inserting in their policies conditions of forfeiture or restriction, except so far as the statute permits.   The statute is not directory only, or subject to be set aside by the company with the consent of the assured; but it is mandatory, and controls the nature and terms of the contract into which the company may induce the assured to enter."   It follows that the insertion in the policy of a provision for a different rule of commutation from that prescribed by the statute, in case of default of payment of premium after three premiums have been paid, as well as the insertion in the application of a clause by which the beneficiary purports to "waive and relinquish all right or claim to any other surrender value than that so provided, whether required by a statute of any state or not," is an ineffectual attempt to evade and nullify the clear words of the statute.   The opinion was delivered May 11, 1891, and will probably appear in volume 140 of United States Reports.