LAMSON BROS. & CO. et al. v. BANE.

(Circuit Court of Appeals, Eighth Circuit. May 2, 1913.)

No. 3,803.

GAMING (§ 2*)—GAMBLING CONTRACTS—ACTION TO RECOVER MARGINS FROM BROKERS—LAW GOVERNING—PLACE OF CONTRACT.

Plaintiff sued defendants, who were brokers having their main office in Chicago, with one of their branch offices in Des Moines, Iowa, to recover certain margins paid by him on contracts for the purchase of railroad stocks, alleging that they were merely wagering contracts on the future price of the stocks and that no actual purchase or delivery was intended. He testified that he applied to make the purchases to defendant's manager in Des Moines; that the manager telegraphed to the Chicago office,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and on receipt of an answer notified him that the stocks had been brought, and he paid the margins to such manager. *Held* that, on plaintiffs' allegations and testimony that no actual purchases of stocks were to be made in Chicago or elsewhere in the execution of the contracts, they were consummated in Des Moines and were governed by the law of Iowa, by which money lost in such transactions is not recoverable.

[Ed. Note.—For other cases, see Gaming, Cent. Dig. § 2; Dec. Dig. § 2.*

Sales or purchases under agreements for settlement of differences between contract price and market price as wagering contracts, see note to Ware v. Pearsons, 98 C. C. A. 368.]

In Error to the District Court of the United States for the Southern District of Iowa; Smith McPherson, Judge.

Action at law by I. W. Bane against Lamson Brothers & Company and others. Judgment for plaintiff, and defendants bring error. Reversed.

Joseph W. Moses, of Chicago, Ill. (Moritz Rosenthal, Henry H. Kennedy, Julius Moses, Hamilton Moses, and Walter Bachrach, all of Chicago, Ill., N. T. Guernsey, of New York City, and W. E. Miller and A. C. Parker, both of Des Moines, Iowa, on the brief), for plaintiffs in error.

Jerry B. Sullivan, of Des Moines, Iowa (John B. Sullivan, of Des Moines, Iowa, on the brief), for defendant in error.

Before HOOK and SMITH, Circuit Judges, and VAN VALKENBURGH, District Judge.

SMITH, Circuit Judge. The defendant in error, I. W. Bane, is a lawyer engaged in the practice of his profession at Des Moines, Iowa, and will hereafter be called the "plaintiff." Lamson Bros. & Co. are composed of L. J. Lamson, W. A. Lamson, and L. F. Gates, and will hereafter be called the "defendants." They have for a considerable period been engaged in business at Chicago, Ill., as brokers and commission merchants. They maintained branches in 14 Iowa cities, one at Des Moines, where three men, including a manager, were employed. The Des Moines office received considerable sums of money which were deposited in a bank in that city, and notice was sent directly to the Chicago office of the amount of these deposits and to whom they should be credited. On December 27, 1909, the plaintiff entered into a contract through the defendants' manager at Des Moines for the purchase of 100 shares of M. K. & T. stock at 48¼, and after being notified that the stock had been purchased he paid $500 as a margin upon it. On January 8, 1910, he similarly contracted to buy 100 shares of Wabash preferred at 57¼, and after being notified that the stock had been purchased paid as a margin thereon the sum of $600. Subsequently he from time to time deposited other sums of money to meet declines in the market until his total deposits amounted to $3,800 including $500 deposited at Chicago while there. Both M. K. & T. stock and Wabash preferred were listed at the Stock Exchange in New York, but neither of them was so listed at Chicago.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

When the plaintiff authorized the purchase of the 100 shares of M. K. & T. stock, the defendant's manager or agent at Des Moines wired them at Chicago to purchase the stock. Defendants telephoned J. J. Townsend & Co., of Chicago, to make the purchase, and they wired to Sternberger, Sinn & Co.. of New York, to make the purchase, and upon their reply that they had done so Townsend & Co. notified the defendants, they sent the news to their Des Moines agency, and it was there delivered to the plaintiff, and he then paid $500 as a margin.

On February 4th, this stock having fallen, the defendants notified J. J. Townsend & Co., to sell the same. They in turn notified Sternberger, Sinn & Co., who reported that they had sold the stock at 39¾. In a similar way when the plaintiff gave his order for the purchase of 100 shares of Wabash preferred the defendants' agency at Des Moines telegraphed the home office at Chicago, which telephoned J. J. Townsend & Co., who in turn wired Sternberger, Sinn & Co., at New York, to purchase the stock. They wired back to J. J. Townsend & Co. that the order had been complied with and the stock cost 57¼. They notified the defendants by telephone, who wired the information to their Des Moines agency, which notified the plaintiff, and thereupon he deposited a margin of $600.

On July 26, 1910, the defendants telegraphed to S. B. Chapin & Co., of New York, to sell the Wabash preferred. They telegraphed back that it had been sold at 30¼. This left a balance due the plaintiff on the defendants' theory of $58.64 for which they sent him a check.

It is the theory of the plaintiff that these were mere gambling transactions, that there was no intention that these stocks should ever be delivered to him, and that if the defendants bought stocks they were "hedging" against loss on their wager.

Under the general law, if these were wagers the plaintiff could not recover the money lost thereon, and this is conceded to be the law of Iowa. Code 1897, §§ 4967, 4968; Counselman & Co. v. Reichart, 103 Iowa, 430, 72 N. W. 490; People's Savings Bank v. Gifford, 108 Iowa, 277, 79 N. W. 63.

But certain states have believed that gambling could be better suppressed by providing that money lost in gambling may be recovered, among them New York, California, Tennessee, and Illinois. The statutes of Illinois contain the following:

"Sec. 130. Gambling in Grain, etc. Whoever contracts to have or give to himself or another the option to sell or buy, at a future time, any grain, or other commodity, stock of any railroad or other company, or gold, or forestalls the market by spreading false rumors to influence the price of commodities therein, or corners the market, or attempts to do so in relation to any of such commodities, shall be fined not less than $10 nor more than $1,000, or confined in the county jail not exceeding one year, or both; and all contracts made in violation of this section shall be considered gambling contracts, and shall be void.

"Sec. 131. Gaming Contracts. All promises, notes, bills, bonds, covenants, contracts, agreements, judgments, mortgages, or other securities or conveyances made, given, granted, drawn or entered into, or executed by any person whatsoever, where the whole or any part of the consideration thereof, shall be for any money, property or other valuable thing, won by any gaming, or playing at cards, dice, or any other game or games, or by betting on the

side or hands of any person gaming, or by wager or bet upon any race, fight, pastime, sport, lot, chance, casualty, election or unknown or contingent event whatever, or for the reimbursing or paying any money or property knowingly lent or advanced at the time and place of such play or bet, to any person or persons so gaming or betting, or that shall, during such play or betting, so play or bet, shall be void and of no effect.

"Sec. 132. Losses by Gaming. Any person who shall, at any time or sitting, by playing at cards, dice or any other game or games, or by betting on the side or hands of such as do game, or by any wager or bet upon any race, fight, pastime, sport, lot, chance, casualty, election of unknown or contingent event whatever, lose to any person, so playing or betting, any sum of money, or other valuable thing, amounting in the whole to the sum of $10, and shall pay or deliver the same or any part thereof, the person so losing and paying or delivering the same, shall be at liberty to sue, for and recover the money, goods or other valuable thing, so lost and paid or delivered, or any part thereof, or the full value of the same, by action of debt, replevin, assumpsit or trover, or proceeding in chancery, from the winner thereof, with costs, in any court of competent jurisdiction. In any such action at law it shall be sufficient for the plaintiff to declare generally as in actions of debt or assumpsit for money had and received by the defendant to the plaintiff's use, or as in actions of replevin or trover upon a supposed finding and the detaining or converting the property of the plaintiff to the use of the defendant, whereby an action hath accrued to the plaintiff according to the form of this act, without setting forth the special matter. In case the person who shall lose such money or other thing, as aforesaid, shall not, within six months, really and bona fide, and without covin or collusion, sue, and with effect prosecute, for such money or other thing, by him lost and paid or delivered, as aforesaid, it shall be lawful for any person to sue for, and recover treble the value of the money, goods, chattels and other things, with costs of suit, by special action on the case, against such winner aforesaid; one-half to use of the county, and the other to the person suing." Hurd's Rev. St. 1911, c. 38.

Assuming that under the Illinois law these were gambling contracts, it then becomes material whether the contracts are governed by the laws of Iowa or of Illinois.

It must be borne in mind that it is the contention of plaintiff that these were gambling contracts, and that he did not in fact buy the M. K. & T. and Wabash preferred, but that he in effect made a wager that the stock would go up against the defendants' wager that it would go down and what defendants did, if anything, in the way of buying such stock or an option thereon, was a mere "hedging" against loss with which he had nothing whatever to do. Consequently upon his theory the contract was never to be performed or executed in the sense of buying the stock, and the court properly charged the jury that:

"If you find that the defendants never intended to deliver the actual stock to the plaintiff upon the payment of the purchase price, and you should then find that defendant did purchase stocks as it did for the purpose of 'hedging' or protecting itself, then the fact that the defendant purchased stock in New York City would not avail it, and there would be no defense here."

It follows that upon the plaintiff's theory that these were gambling contracts there was nothing to do in Illinois or New York with reference to the purchase of stocks. This is important, as it is conclusive that upon the plaintiff's theory the contracts were not to be performed by the purchase of stocks either in Illinois or New York. It is important because in many cases where contracts are made to be per-

formed in another state the law of such other state governs the construction of the contract. This contract was to be governed solely by the place of its execution and not at all by the law of the place of its performance. If these were Illinois contracts, it must be because they were made in Illinois. The court charged the jury in this connection:

"The defendants' main office was in Chicago and the state of Illinois. For a time at least it had a branch office here in the city of Des Moines. With the exception of one transaction as I recall the evidence, so far as the plaintiff is concerned, he said and did here in Des Moines what he did say and do. Now upon this question you are instructed that if you find from the testimony that the defendant had a branch house in Des Moines, and that it had an agent with authority to solicit business, enter into deals, and receive money, but without authority to make contracts, and if you find that the order to purchase said stock made by the plaintiff on December 27, 1909, and January 8, 1910, was transmitted by the agent of defendants in Des Moines to the defendants' office at Chicago, Ill., and there accepted, then you are instructed that the contract would be an Illinois contract and covered by the Illinois laws, and so far as that branch of the case was concerned, in that event you find for the plaintiff if you find the other matters already alluded to in his favor.

"Now it is in testimony that Mr. Roovart and Mr. Williams represented the defendants at Des Moines, and as such did solici. the order or orders from the plaintiff, and at the time of the solicitation did not make and execute a contract, but wired the order to Chicago, and it was there, within the state of Illinois, executed in the state of Illinois. It is not decisive where the money was paid. The question is: Where was the contract to be executed, in Iowa or Illinois? And if you find that it occurred in Chicago, then it becomes an Illinois contract."

The defendants had their principal place of business at Chicago and a branch at Des Moines. If these were bona fide contracts to buy stocks, then they were governed by the law of the state where the stocks were to be bought, and if the defendants held themselves out as selling such stocks, and plaintiff contracted with them to buy, and nothing was said as to where they would be obtained, it might be contended that plaintiff understood they were to be bought where defendants' principal business was; but the plaintiff insisted that he never knew any stocks were to be bought or sold, that he merely made a wager with defendants that the stock would go up and they wagered that it would go down. There was no agreement, on plaintiff's theory, that could change the applicable law from the place of the making of the contract to the place of performance.

The plaintiff testified that Mr. Roovart, the defendants' manager at Des Moines, said:

"That the adjustment would be just in this way: That if I would buy the stock and put up a little money and the stock raised, then the raise in the price—why, I would gain that much. If it went down, I would lose the difference between the amount I put up for it and the amount I sold for after it went down; and if it went up I would gain that difference; there wasn't to be any actual delivery of the stock, he said; the way we would buy them and deal in stock was on the rise and fall in the market. If it fell, why I would make; if it decreased, I would lose."

"The next transactions afterwards with the defendant company was December 27, 1909. I went in the office. Mr. Roovart was their manager, and gave him an order to purchase a hundred shares of M. K. & T. It was December 27th.

"Q. You gave him an order. I wish you would explain to the jury just how that order was—what you did, and what Mr. Roovart did, and what the defendants did.

"A. I went into the office. Mr. Roovart was there, and we talked the matter over again; and the prices was coming all the time over the telegraph instrument, and they would be marked by a chalk on the board, and we could see just what the price was for this M. K. & T. stock. I finally says to Mr. Roovart, 'Buy,' and gave him this order, 'Buy 100 shares of M. K. & T.,' and then he immediately turned around, or had one of his men there at the office with the telegraph instrument, telegraph. Probably three minutes afterwards, maybe five, just a short time, he came back and says, 'We have bought for you a hundred shares of M. K. & T.'

"Q. What did you then do with reference to payment?

"A. After I got this word back that he had, as Mr. Roovart said he had, bought a hundred shares of M. K. & T., then I says, 'I suppose I will have to put up my money.' He says, 'Yes, 10 per cent. of the amount purchased.' That was 10 per cent. of the M. K. & T. stock—I think the order was at 48¼, and I think I gave him a check for $500."

The undisputed evidence is that whatever this contract was, whether a contract for future delivery as it purported to be, or a gambling contract, plaintiff went to the defendants' manager at Des Moines and there authorized the purchase of the stock in question; the defendants' agent claiming it was a bona fide purchase wired the Chicago office. Defendants wired back, not to plaintiff, but to their agent at Des Moines, that the purchase was made. The Des Moines agency so notified the plaintiff at Des Moines and he there paid the 10 per cent. margin.

Importance is attached to the fact that the wire from Chicago to Des Moines was to the defendants' agent and not to the plaintiff.

It is plaintiff's theory that the defendants' agent at Des Moines did not have general authority to close the contract. Let it be so conceded. Plaintiff, nominally at least, ordered the purchase of the M. K. & T. and Wabash preferred. This he did with the Des Moines and not directly to the Chicago office. The Chicago office sent no message to the plaintiff, but sent a message to its agent at Des Moines. Thus far the transactions tending to a contract were wholly between the plaintiff and the defendants' agent at Des Moines. There was nothing in that to constitute an agreement. The Des Moines agent then told the plaintiff the stock had been bought and plaintiff put up his margin. That closed the contract at Des Moines. There was no evidence of legal acceptance at Chicago.

Owing to the fact that insurance companies usually conduct their business in states other than their home office, insurance cases are cited by both sides to this controversy and they bear a very considerable analogy to this case.

If the application for insurance be made in one state and sent to the home office in another state and is there accepted and a policy issued upon it and sent by mail to the applicant, it is delivered the moment it is deposited in the mail, and consequently is deemed to have been executed in the state of the home office of the company. Tuttle v. The Iowa State Traveling Men's Ass'n, 132 Iowa, 652, 104 N. W. 1131, 7 L. R. A. (N. S.) 223.

On the other hand, if an application be made to an insurance solicitor who has no authority to make contracts of insurance and is by him sent to the home office of the company and is accepted by the company and a policy is issued and sent to the soliciting agent and delivered by him and he collects the premium, the contract is deemed to have been made in the state where the application was made and the policy delivered by the soliciting agent. Brewer, Circuit Judge, in Wall v. Equitable Life Assur. Soc. (C. C.) 32 Fed. 273.

That case was considered by the Supreme Court in Equitable Life Assurance Society v. Clements, 140 U. S. 226, 11 Sup. Ct. 822, 35 L. Ed. 497, and Mr. Justice Gray in that case said:

"The petition further alleges that the policy was delivered in Missouri; and the answer admits that the policy was 'at the request of the said Wall, transmitted to the state of Missouri and was delivered to said Wall in said state.' If this form of admission does not imply that the policy was at the request of Wall transmitted to another person, perhaps the company's agent, in Missouri, and by him there delivered to Wall, it is quite consistent with such a state of facts; and there is no evidence whatever, or even averment, that the policy was transmitted by mail directly to Wall, or that the company signified to Wall its acceptance of his application in any other way than by the delivery of the policy to him in Missouri. Upon this record, the conclusion is inevitable that the policy never became a completed contract, binding either party to it, until the delivery of the policy and the payment of the first premium in Missouri; and consequently that the policy is a Missouri contract and governed by the laws of Missouri."

Berry et al. v. Knights Templars' & Masons' Life Indemnity Co. (C. C.) 46 Fed. 439. That case was affirmed by this court in 50 Fed. 511, 1 C. C. A. 561. Mutual Benefit Life Ins. Co. v. Robison (C. C.) 54 Fed. 580. This case was appealed to this court, 58 Fed. 723, 7 C. C. A. 444, 22 L. R. A. 325, but doubtless out of deference to our opinion in Knights Templar & Masons' Life Indemnity Co. v. Berry, 50 Fed. 511, 1 C. C. A. 561, the question was not again urged in this court and appears not to have been considered. Equitable Life Assur. Soc. of the United States v. Winning, 58 Fed. 541, 7 C. C. A. 359; Northwestern Mutual Life Ins. Co. v. Elliott et al. (C. C.) 5 Fed. 225; In re Petition of Insurance Co. of the State of Pennsylvania (D. C.) 22 Fed. 109; Kelley v. Mutual Life Ins. Co. (C. C.) 109 Fed. 56; Albro v. Manhattan Life Ins. Co. (C. C.) 119 Fed. 629.

If the Des Moines agency had no authority to make the alleged wagering contract with the plaintiff and had telegraphed the home office, and it in turn had telegraphed directly to the plaintiff that his proposition was accepted, and he had then gone and paid the first margin at the Des Moines agency, there would be room for the contention that the contract was closed when the defendants delivered the telegram for transmission at Chicago; but, taking the most favorable view of the case for the plaintiff, if this was a wagering contract, and if the Des Moines agency had no authority to make it and telegraphed to Chicago and the defendants there decided to accept the contract and so telegraphed the agency at Des Moines, and that agency notified the plaintiff and took his money, the contract was consummated at Des Moines, and under the policy of Iowa the plaintiff could not recover even

though he afterwards paid upon the contract a subsequent margin at Chicago.

There being no evidence that the contract was accepted in Illinois, within the meaning of the instruction given by the court, it was necessarily error to submit that question to the jury, and the case is reversed and remanded, with directions to set aside the verdict and grant a new trial.