## GETTYS et al. v. NEWBURGER et al.

(Circuit Court of Appeals, Eighth Circuit. March 25, 1921. Rehearing Denied June 13, 1921.)

### No. 5631.

1. **Frauds, statute of** ⟨⟩**115(3)—Brokers' bought and sold slips admissible, though not showing names and addresses of both parties, without the corresponding slip.**

Where brokers' bought and sold slips, evidencing sales of cotton for future delivery, gave the address of the party to be charged, and there was testimony that, when each bought slip was signed, a corresponding sold slip was signed by the party to be charged thereby, and that when each sold slip was signed a corresponding bought slip was signed, the slips were admissible, under Cotton Futures Act, §§ 4, 5 (Comp. St. §§ 6309d, 6309e), requiring contracts to be in writing and to give the names and addresses of the seller and buyer.

2. **Frauds, statute of** ⟨⟩**158(2)—Presumed that brokers' bought and sold slips were executed at same time and together showed parties' names and addresses.**

Where brokers' bought and sold slips, evidencing sales of cotton for future delivery, gave the address of the party to be charged, the legal presumption was that when each bought slip was signed a corresponding sold slip was signed by the party to be charged thereby, and vice versa, and that the two corresponding slips set forth the names and addresses of both parties, as required by Cotton Futures Act, §§ 4, 5 (Comp. St. §§ 6309d, 6309e).

3. **Brokers** ⟨⟩**21—Are authorized to deal according to rules and usages of exchange.**

One sending an order to a broker, doing business in an established trade on one of the great public exchanges of the country to buy, sell, or make contracts on such exchange, confers on the broker authority to deal in the terms and language understood and used there, and in accordance with the settled usage and the by-laws and rules of the exchange, though he may not know their terms or effect.

4. **Frauds, statute of** ⟨⟩**112—Brokers' sold slips held to show price with sufficient certainty.**

A broker's sold slip, evidencing a sale of cotton for future delivery at "1861," *held* to state with sufficient clearness and certainty, to satisfy Cotton Futures Act, §§ 4, 5 (Comp. St. §§ 6309d, 6309e), that the sale was at the price of 18.61 cents per pound, when read in the light of the testimony and of a by-law of the cotton exchange through which the sale was made.

5. **Appeal and error** ⟨⟩**1050(2)—Admission of brokers' bought and sold slips not prejudicial, where relating to transactions which had been settled.**

In a cotton broker's action against a customer for a balance due on account, it was immaterial that bought slips evidencing certain sales on their face showed sales by G. & Co. to itself, where they related to transactions which were closed out and liquidated prior to November 27, 1916, at which time all previous transactions were settled and liquidated, and the only controversy concerned subsequent transactions.

6. **Brokers** ⟨⟩**88(7)—Instruction that purchases and sales of cotton were valid and legal not erroneous, because of irregularities in two contracts.**

As a cotton broker's action against a customer for a balance due on an account was not an action on the contracts of purchase and sale made for the customer, irregularities in the form of one or two of such contracts were insufficient to render erroneous or prejudicial an instruction that the purchases and sales were effected by the broker in a valid and legal manner.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

272 F.—14

**7. Gaming ⚎49(1)—Contracts for future delivery are presumed valid, and must be proved invalid.**

As a general rule, contracts for the purchase or sale of cotton, grain, or other personal property on the great public exchanges of the country, to be delivered in the future in accordance with the by-laws, rules, and settled usages of such exchanges, or in private between man and man, are lawful and valid, and the burden is on one who assails them to establish their invalidity, by proof sufficient to overcome the legal presumption of validity.

**8. Gaming ⚎14—When contracts for future delivery invalid stated.**

It is only when, under the guise of a legal contract for the purchase or sale of goods to be delivered at a future time, the parties to it really intend when the contract is made that its obligations shall be discharged by the payment of the difference between the contract price and market price at the date fixed in the contract for performance, that the transaction becomes a wager and unlawful.

**9. Gaming ⚎14—When broker's account in connection with sales for future delivery unenforceable stated.**

It is only when the parties to a contract for the sale of goods to be delivered at a future time intend to discharge its obligations by the payment of the difference between the contract price and the market price at the time of performance, and a broker employed to make the contract participates in or is aware of such intention, that his account for advances or commissions is unenforceable.

**10. Gaming ⚎14—Contracts for future delivery invalid, if there is intention to pay differences, whether or not there is intention not to deliver goods; "wagering contract."**

If the parties to a contract of sale for future delivery intend when the contract is made to discharge their obligations by the payment of the difference between the contract price and the market price at the time fixed for performance, the contract is a "wagering contract," whether or not it is also their intention not to deliver, receive, or pay for the commodity at the time fixed for delivery.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Wager—Wagering Contract.]

**11. Gaming ⚎12—Contracts for future delivery not invalid because of intention to settle before time for delivery by sales, set-off, or ringing off.**

That the parties to a contract of sale for future delivery intend to close out the contract and settle their obligations, without delivering or paying for the commodity by sales, direct set-offs, or by ringing off before the time of delivery specified arrives, does not make or tend to prove the contract a wagering contract, as such methods of closing out such contracts are not illegal.

**12. Gaming ⚎49(1)—Presumed that parties intended to close out contracts for future delivery in legal ways.**

Where contracts of sale for future delivery are closed out before the specified times for delivery, the legal presumption is, in the absence of substantial evidence to the contrary, that when the parties made the contracts they intended to close them out by the legal methods of sales, direct set-offs, or ringing off before time of delivery, and not by the illegal method of paying the difference between the contract price and the market price at the times of delivery.

**13. Gaming ⚎49(2)—Evidence admissible to prove wrongful intent in sales for future delivery specified.**

The intention of the parties to a contract of sale for future delivery to close out and settle the contract by the payment of the difference between the contract and market prices, and a broker's knowledge of and participation in such intention, may be proved by the intention, admissions against interest, acts, and conduct of the parties tending to prove such intention and knowledge.

⚎For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**14. Gaming ⟨key⟩11—Pernicious intention on part of both, and broker's participation or knowledge, must be preved.**

To defeat a cotton broker's action against a customer for a balance due on account, on the ground that the contracts made through the broker were wagering contracts, there must be competent evidence that the parties on both sides had the pernicious intention which constitutes the contracts mere wagers, and that the brokers either participated therein, or were aware of that intention.

**15. Gaming ⟨key⟩49(3)—That many deals in cotton are settled without delivery does not show pernicious intent.**

That the larger portion or all of the dealings of a cotton broker or a customer, or of the dealings on the New York Cotton Exchange, are settled and discharged without the delivery or receipt of any property, does not constitute substantial evidence that particular contracts made for the customer by the broker for future delivery were tainted with the intention to close out the contracts by the payment of differences between contract and market prices, as nondelivery of property characterizes valid contracts settled pursuant to a lawful intention to close them out in legal ways.

**16. Gaming ⟨key⟩49(3)—That contracts for future delivery disposed of without delivery call for more cotton than is received does not evidence pernicious intent.**

That contracts for the future delivery of cotton, made through the New York Cotton Exchange and disposed of without the delivery of any cotton, call for many times the total receipts of cotton in New York, is not evidence that such contracts are made with the intention of settling them by the payment of differences between contract and market prices.

**17. Gaming ⟨key⟩49(3)—Putting up margins does not show pernicious intent or broker's knowledge thereof.**

That a customer, buying and selling cotton for future delivery through a broker, put up, and the broker received and accepted, margins to protect the broker from loss in executing the customer's orders, was not evidence that any of the parties to the contract had the pernicious intention to settle by the mere payment of differences beween contract and market prices, or that the brokers were aware of such intention.

**18. Gaming ⟨key⟩12—Sale of equal amount subsequent to purchase for future delivery and set-off or ringing off not illegal.**

A customer, buying cotton for future delivery through a broker, had a legal right to sell an equal amount subsequently on the same day, and to close out and settle both contracts by set-off and ringing off, and the payment or receipt of the difference on that day.

**19. Gaming ⟨key⟩49(3)—That parties closed out contracts before time for delivery tended to negative illegal intent.**

That contracts for the purchase or sale of cotton for future delivery were closed out and settled long before the dates of delivery fixed in the contracts strongly tended to show that they did not intend to settle them by the mere payment or receipt of the difference between the contract and market prices at the agreed times for delivery.

**20. Brokers ⟨key⟩88(6)—Letter stating balance due on account held not to create conflict, when shown to have been sent by mistake.**

In a cotton broker's action against a customer for a balance due on an account, a letter written by the broker to the customer, stating the balance of the account at that time, did not create a conflict in the evidence as to amount due, so as to present a question for the jury, where the testimony as to the actual state of the account was positive and uncontradicted, and the letter was shown to have been sent by mistake of one of the broker's clerks or employés, and there was no testimony that the statement therein was true, or that the customer was misled by or acted on it.

Carland, Circuit Judge, dissenting.

⟨key⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge.

Action by Silvan Newburger and others, a copartnership doing business as Silvan Newburger & Co., against Seth Gettys and another, a partnership doing business as Gettys & Prescott. Judgment for plaintiffs, and defendants bring error. Affirmed.

H. L. Stuart, of Oklahoma City, Okl. (W. A. Ledbetter, R. R. Bell, and E. P. Ledbetter, all of Oklahoma City, Okl., on the brief), for plaintiffs in error.

H. G. Snyder and F. B. Owen, both of Oklahoma City, Okl. (Bernard Titche, of New Orleans, La., and Henry E. Asp and W. A. Lybrand, both of Oklahoma City, Okl., on the brief), for defendants in error.

Before SANBORN and CARLAND, Circuit Judges, and LEWIS, District Judge.

SANBORN, Circuit Judge. Silvan Newburger & Co. was a copartnership, composed of the plaintiffs below, and Gettys & Prescott was a copartnership, composed of the defendants below. The plaintiffs were cotton brokers at New Orleans, and held a seat on the New York Cotton Exchange. The defendants were engaged in the cotton business in the state of Oklahoma. The plaintiffs brought this action to recover a balance of an account between them and the defendants for moneys expended by the plaintiffs in the execution of telegraphic orders of the defendants to them between October 30 and December 12, 1916, to make contracts for the defendants on the New York Cotton Exchange in accordance with the provisions of the Cotton Futures Act of August 11, 1916, and the rules and customs of the exchange for the purchase and sale of cotton to be delivered in March, 1917. The complaint contained allegations of a cause of action for the recovery of the alleged balance of such an account amounting to $8,338.78.

The answer of the defendants was: (1) That they never authorized the plaintiffs to make any of the contracts alleged, except the first one, which was ordered and made on October 31, 1916, for the purchase of 100 bales of cotton, to be delivered in March, 1917, and that this contract was closed out by means of the sale of a like amount of cotton on the same day with a profit; and (2) that the contracts and transactions averred in the complaint were wagering contracts and transactions.

The first issue in the case was whether or not the defendants ordered or authorized the plaintiffs to make the contracts of purchase and sale alleged in the complaint. The defendants admitted that on October 31, 1916, they sent the plaintiffs their first telegraphic order to make for them on the New York Cotton Exchange a contract for the purchase of 100 bales of cotton to be delivered in March, 1917, and that they sent the plaintiffs $500 as a margin to protect them against loss; but they testified that they did this for Mr. Barrett and Mr. Martin, and that they never made or authorized any other orders to the plaintiffs for the purchase or sale of cotton futures. But subsequent telegraphic orders for all the purchases and sales alleged over

the defendants' firm name, as was the first order, letters over their firm name acknowledging receipt of notices of contracts of sale and purchases of cotton futures, drafts over their firm name which the plaintiffs paid, and telegrams, notices, and letters from the plaintiffs, addressed to the defendants' firm name, were introduced in evidence.

There was evidence tending to prove that Mr. Barrett, for whom the defendants testified they made the first order and put up the first $500 margin, conducted all the transactions, orders, and correspondence in controversy in the defendants' firm name, and there was persuasive testimony on the part of the plaintiffs that they never knew Barrett or Martin as principals in the transactions, but dealt with and relied on the defendants alone. The court submitted to the jury with appropriate instructions the question whether or not under the evidence in the case the defendants authorized Mr. Barrett to make the orders and conduct the transactions for the defendants in their firm name, or gave him such apparent authority so to do that the plaintiffs in good faith and in the exercise of reasonable prudence believed and acted on the belief that the orders and communications over the defendants' firm name were made or authorized by them, and the jury found this issue for the plaintiffs and rendered a verdict in their favor for the alleged balance of their account.

In the course of the trial the plaintiffs introduced in evidence a telegraphic order from the defendants for every contract of purchase or sale in controversy, except for the sale of the last 1,100 bales on December 11, 1916, which were made for the plaintiffs' account, pursuant to the agreement of the parties and the by-laws and settled usages of the New York Cotton Exchange, after, upon demand, the defendants had failed to pay moneys due from them to the plaintiffs, and to deposit the necessary moneys to protect the plaintiffs against loss on the contracts of purchase that the plaintiffs had made or caused to be made on the defendants' orders. The evidence in the case contained plenary proof that the plaintiffs, on the receipt of each order from the defendants, telegraphed to their brokers on the New York Cotton Exchange a like order; that those brokers immediately executed the order in accordance with the provisions of section 5 of the Cotton Futures Act (Comp. St. § 6309d) and the by-laws and settled usages of the New York Cotton Exchange. The written bought and sold brokers' slips evidencing all these transactions thus ordered by the defendants were introduced in evidence. Immediately upon the execution of each order a telegraphic notice thereof, followed by a confirmatory letter, was sent to the defendants, and at the trial these notices were put in evidence. The book account of the plaintiffs was verified by competent witnesses and introduced in evidence.

At the close of all the evidence the court denied a motion of the defendants to instruct the jury to return a verdict in their favor, and instructed them: (1) That there was no controversy as to the regularity or good faith of the transactions, that the only evidence was that the transactions were regular and conformed to the law, that it showed their validity in terms and sustained them, that there was no evidence to show that delivery of the cotton was not in fact intended,

that the cotton purchases and sales were made in a valid and regular manner and that the jury should so regard them; and (2) that the undisputed evidence was that the plaintiffs' account was correct, and that the jury should regard it as unsatisfied to the extent of the balance thereof, $8,338.78.

The complaints which defendants' counsel make of this trial are: (1) That the court received in evidence the bought and sold written brokers' slips which evidenced the contracts of purchase and sale made in obedience to the defendants' orders, and charged the jury that they were in compliance with the law; (2) that the court instructed the jury that there was no controversy as to the good faith of the transactions, that there was no evidence to show that the delivery of the cotton was not intended, and that the only evidence showed that the transactions were valid in terms and sustained them; and (3) that the court charged the jury that the undisputed evidence sustained the verity of the plaintiffs' account and that the jury should regard it as correct.

[1-6] The argument of counsel for the defendants in support of their first complaint is that the brokers' slips evidencing the contracts failed to comply with sections 4 and 5 of the Cotton Futures Act of August 11, 1916, c. 313, 39 Stat. 476, Comp. Stat. §§ 6309d and 6309e, which require each contract to "be in writing plainly stating, or evidenced by written memorandum showing, the terms of such contract, including the quality of the cotton involved and the names and addresses of the seller and buyer in such contract. * * * Each bale shall, for the purposes of this Act, be deemed to weigh five hundred pounds"—

(1) Because none of the slips gives the addresses of both buyer and seller, but each of them, with so few exceptions as to be immaterial, gives the address of the party to be charged; but the legal presumption and the testimony are that, at the same time that each bought slip was signed, a corresponding sold slip mutatis mutandis was signed by the party to be charged thereby, and that at the time that each sold slip was signed a corresponding bought slip mutatis mutandis was signed by the party to be charged (Thorn v. Browne, 257 Fed. [8th C. C. A.] 519, 524, 168 C. C. A. 469), and thus the presumption arose that the two corresponding slips which evidenced each contract set forth the addresses as well as the names of the seller and the buyer in each contract.

(2) Because none of the slips states the quantity or price of the cotton bought or sold per pound or bale in dollars and cents, for example, the sold note or slip which Gwathmey & Co., the correspondents in New York of the plaintiffs, took from the sellers evidencing the latter's contract to sell the 100 bales of cotton which the defendants admit they ordered the plaintiffs to buy by their telegram in these words:

"Oct. 31, 1916. Frederick, Okla 815 A Oct. 31, 1916.
"S. Newberger & Co., New Orleans, La.
"Buy one hundred March NY on opening margin five check by mail
"846 A                                    Gettys & Prescott"

—reads in this way:

"New York, 10/31, 1916.

"Sold to Gwathmey & Co., and agree to deliver to them, subject to the by-laws and rules of the New York Cotton Exchange, and subject to the United States Future Act, section 5, 100 B/C Mch Delivery at 1861

"Caldwell, Cosgrove & Co.,

"96 Cotton Exchange, N. Y. City."

But, when one sends an order to a broker doing business in an established trade on one of the great public exchanges of the country to buy, sell, or make contracts on such an exchange, he confers upon such broker authority to deal in the terms and language understood and used there, and in accordance with the settled usage and the by-laws and rules of the exchange, even though he may not know their terms or effect. Clews v. Jamieson, 182 U. S. 461, 481, 21 Sup. Ct. 845, 45 L. Ed. 1183; Wilhite v. Houston (8th C. C. A.) 200 Fed. 390, 392, 118 C. C. A. 542; Bibb v. Allen, 149 U. S. 489, 491, 13 Sup. Ct. 950, 37 L. Ed. 819. One of the by-laws of the New York Cotton Exchange in evidence provided that the contracts of sale and purchase should be "at the price of ———— cents per pound for middlings," where no other grade was specified. One of the plaintiffs testified that he sent the telegram above quoted. To the question, "It says here, 'Buy one hundred March N. Y. on opening, margin five, check by mail.' The margin—what does that mean, 'margin five?'" he answered: "$500 that meant, or $5 a bale." Read in the light of the quoted by-law, of this and other testimony in the record, and of the accounts of these transactions in evidence, there was no doubt that this contract meant, and that the defendants knew it meant, that Caldwell, Cosgrove & Co. agreed to sell and deliver to Gwathmey & Co. in March, 1916, 100 bales of cotton at the price of 18.61 cents per pound. This and all the other contracts and telegrams in evidence state with sufficient clearness and certainty the quantities and prices of the cotton to which they refer, in view of the by-laws and settled usages of the New York Cotton Exchange and the other evidence in this case.

(3) Because two of the bought slips evidencing sales made on November 18 and December 11, 1916, respectively, by Gwathmey & Co., pursuant to the defendants' orders, failed to show the address of the purchasers who signed them and were to be charged thereby, and because 6 of the slips, evidencing 6 of the 22 transactions disclosed by the account, were on their faces contracts of Gwathmey & Co. with Gwathmey & Co. But in each of the 6 instances Gwathmey & Co. were ordered by the plaintiffs, pursuant to the orders of the defendants, to buy or sell, as the transaction was, and they reported back to the plaintiffs in writing that they had bought or sold, as the transaction was, the cotton described in these contracts, and thereby charged themselves with liability to the plaintiffs under their reports of these contracts, and 5 of these transactions, all but one transaction for the sale of 100 bales, were made, closed out, and liquidated between the parties before November 27, 1916, at which time, by the admission of both parties to this suit, all previous transactions between them had been settled and liquidated by the payment by the plaintiffs to the defendants of the latter's draft for $2,350 for the amount owing to the defend-

ants at that time. The only controversy between the parties in this action concerns the transactions subsequent to November 27, 1916. There was, therefore, no prejudicial error in the treatment at the trial of the transactions made prior to that date.

There remains one bought slip, dated December 11, 1916, which fails to disclose the address of the party to be charged, and one sold slip, of November 28, 1916, for 100 bales of cotton, in which Gwathmey & Co. appear to be both buyers and sellers. But as this is not an action upon any of these contracts, but an action upon the account for moneys advanced upon the proved orders of the defendants, and there is plenary evidence of the correctness of the account, the irregularity in the form of one or two of these contracts is clearly insufficient to sustain any charge of error of law prejudicial to the defendants in the instruction of the court that the cotton purchases and sales here involved were effected by the plaintiffs in a valid and legal manner.

[7] Counsel for the defendants next contend that there was substantial evidence at the trial that the contracts which were made in November and December, 1916, to buy and sell cotton to be delivered in March, 1917, were wagering contracts, that the parties to them intended to settle them by the payment of the differences between the contract price and the market price, and not to deliver any cotton thereunder, and that the instructions of the court that there was no controversy as to the regularity or good faith of the transactions in which these contracts are involved, and no evidence that delivery of the cotton was not in fact intended, was error. But the contracts of purchase and sale complied with the provisions of the Cotton Futures Act, which was enacted to provide and define a way whereby valid and enforceable contracts to buy and sell cotton to be delivered in the future could be made with confidence and security. It is a general rule of law that contracts for the purchase or sale of cotton or grain and other personal property upon the great public exchanges of the country to be delivered in the future in accordance with the by-laws, rules, and settled usages of such exchanges, or in private between man and man, are lawful and valid, and the burden is upon him who assails them to establish their invalidity by proof sufficient to overcome the legal presumption of their validity, and of the lawful action and intent of the parties who made and acted under them, which always arises from and accompanies them. Irwin v. Williar, 110 U. S. 499, 507, 510, 4 Sup. Ct. 160, 28 L. Ed. 225; Bibb v. Allen, 149 U. S. 481, 482, 492, 13 Sup. Ct. 950, 37 L. Ed. 819; Clews v. Jamieson, 182 U. S. 461, 489, 490, 491, 21 Sup. Ct. 845, 45 L. Ed. 1183; Ponder v. Jerome Hill Cotton Co., 100 Fed. (8th C. C. A.) 373, 376, 40 C. C. A. 416; Cleage v. Laidley, 149 Fed. (8th C. C. A.) 346, 352, 79 C. C. A. 284; Wilhite v. Houston, 200 Fed. (8th C. C. A.) 390, 392, 118 C. C. A. 542.

Such contracts may indeed be the cover for illegal wagers, and for that reason may be against public policy and void. What, then, is the vice which renders such presumptively lawful contracts against public policy and void? And what evidence is competent and material to prove that vice? Some conflict, uncertainty, and confusion may be

found in the discussions and opinions of the many courts that have considered what the proper answers are to these questions. As, however, the Supreme Court has answered them and as its opinions are controlling authority in this court, let us endeavor to discover the answers to them which that court, and the courts which have followed it, have given before we undertake to determine whether or not there was substantial evidence in this case that the contracts and transactions involved in this case were illegal wagers.

[8-10] A careful reading, comparison, and study of the pertinent opinions of the Supreme Court leads to the conclusions that: It is only when under the guise of a legal contract for the purchase or sale of goods to be delivered at a future time such as those here in evidence, parties to it really intend, when the contract is made, that its obligations shall be discharged by the payment by one party to the other of the difference between the contract price and the market price of the goods at the date fixed in the contract for performing it that the transaction becomes a wager and unlawful, and that it is only when a broker employed to make the contract participates in or is aware of such an intention of both parties thereto that his account for advances or commissions becomes unenforceable. Irwin v. Williar, 110 U. S. 499, 507, 510, 4 Sup. Ct. 160, 28 L. Ed. 225; Embrey v. Jemison, 131 U. S. 336, 338, 344, 9 Sup. Ct. 776, 33 L. Ed. 172; Clews v. Jamieson, 182 U. S. 461, 489, 21 Sup. Ct. 845, 45 L. Ed. 1183; Board of Trade v. Christie Grain Co., 198 U. S. 249, 25 Sup. Ct. 637, 49 L. Ed. 1031; Ponder v. Jerome Hill Cotton Co., 100 Fed. (8th C. C. A.) 373, 376, 40 C. C. A. 416; Cleage v. Laidley, 149 Fed. (8th C. C. A.) 346, 351, 79 C. C. A. 284. In Irwin v. Williar, the definition of the vice which might avoid an otherwise valid contract of purchase or sale for future delivery which the Supreme Court accepted as a correct statement of the law on this point read:

"If, however, at the time of entering into a contract for a sale of personal property for future delivery it be contemplated by both parties that at the time fixed for delivery the purchaser shall merely receive or pay the difference between the contract and the market price, the transaction is a wager, and nothing more." 110 U. S. 508, 4 Sup. Ct. 165, 28 L. Ed. 225.

And to this definition of the vice which renders such a contract a wagering one, that court has since adhered. It has been often correctly said in the discussion of this question by courts and counsel, that if the parties, at the time the contract is made, have the intention: First, to discharge their obligations under the contract by the payment of the difference between the contract price and the market price at the time fixed in the contract for its preformance; and, second, if they also have the intention not to deliver, receive, or pay for the commodity at the time fixed for its delivery in the agreement—the contract is a wager and illegal. But the only intention indispensable to the existence of the wager is the first one. If that intention exists at the time the contract is made it is a wagering contract whether the second intention exists or not, because there is no way consistent with the laws and the public policy against wagers that the first intention can exist at

the time the contract is made without a violation of the laws and public policy against wagers.

[11] On the other hand, there are lawful customary and generally prevailing methods of closing out such contracts, settling them and discharging the obligations of the parties thereunder which do not render such contracts wagering contracts or illegal, to wit: (1) By sales; (2) by direct set-offs; and (3) by ringing off before the times of delivery specified in the contracts arrive, so that when those times come no liability to deliver or to pay will exist, and if the parties, when they make such a contract intend not to deliver or to pay for the commodity at the time fixed in the contract therefor because they intend to close out the contract and to settle their obligations thereunder by the use of these lawful methods before the time fixed for the delivery arrives, that intention not to pay or deliver is consistent with the laws and the public policy regarding wagers and it does not make or tend to prove such a contract a wagering contract, illegal or void. Board of Trade v. Christie Grain & Stock Co., 198 U. S. 238, 247, 248, 250, 25 Sup. Ct. 637, 49 L. Ed. 1031; Cleage v. Laidley, 149 Fed. (8th C. C. A.) 346, 351, 352, 353, 79 C. C. A. 284; Ponder v. Jerome Hill Cotton Co., 100 Fed. (8th C. C. A.) 373, 376, 40 C. C. A. 416. In Board of Trade v. Christie Grain Co. the defense was that the board kept places wherein it permitted the pretended buying and selling of grain, etc., without the intention of receiving and paying for the property so bought or delivering the property so sold. There was proof that in not less than three-fourths of the transactions in the grain pit of the Chicago Board there was no physical handing over of any grain but that there was a settlement, either by the direct method of set-off or by ringing up. Direct set-offs, ringing up or ringing off and hedging were fully described in the opinion of the Supreme Court in that case, 198 U. S. 247, 248, 249, 25 Sup. Ct. 639, 49 L. Ed. 1038, and held to be legal methods of settling contracts for the delivery of grain or other personal property before the times fixed in the contracts for their delivery arrived, so that no actual delivery would be required or made or paid for, and the court held that the defense pleaded was not sustained by the evidence, and said:

"The fact that contracts are satisfied in this way by set-off and the payment of differences detracts in no degree from the good faith of the parties, and if the parties know when they make such contracts that they are very likely to have a chance to satisfy them in that way, and intend to make use of it, that fact is perfectly consistent with a serious business purpose, and an intent that the contract shall mean what it says. * * * Purchases made with the understanding that the contract will be settled by paying the difference between the contract and the market price at a certain time (Embrey v. Jemison, 131 U. S. 336; Weare v. People, 209 Ill. 528), stand on different ground from purchases made merely with the expectation that they will be satisfied by set-off."

In Cleage v. Laidley, 149 Fed. (8th C. C. A.) 346, 350, 79 C. C. A. 284, the defendant bought, through his brokers, 14,000,000 bushels of wheat under and in accordance with the rules of the Chicago Board of Trade and sold nearly as much, so that more than 98 per cent. of his contracts were settled by set-offs and ringing off, without any actual

delivery of grain; but this court held that his intention to close out and settle his contracts in that way, and to deliver, receive, and pay for no grain thereunder because they were settled in that way did not render his agreement wagering, nor relieve him from liability to his brokers for moneys advanced by them in these transactions on his orders. So it is that the answer to the first question under discussion is:

[12] The vice which renders contracts of purchase or sale of cotton, grain, or other personal property to be delivered in the future, which are valid on their faces, wagering contracts and illegal, is the intention of both parties, when they are made, that they shall be settled and the obligations under them discharged by the payment of the differences between the contract and the market prices of the property at the respective times fixed in the contracts for their delivery. There are lawful methods, to wit: By set-off and ringing off, and the payment of the differences, of closing out such contracts and discharging the liabilities of the parties thereunder before the times for deliveries of the property fixed therein arrive, so that no liability to deliver or receive or pay will exist at the fixed times for delivery. Where such contracts are closed out before such times of delivery, the legal presumption is, in the absence of substantial evidence to the contrary, that at the time the parties made the contracts they intended to close them out by these legal methods, and not by the illegal method of paying the difference between the contract prices and the market prices at the times of delivery, so that there would be no liability to deliver and no delivery of the property at such times for deliveries, and this intention is a lawful intention which does not detract from the good faith of the parties or the validity of the contracts.

[13] The second question is what evidence is and what is not competent and material to prove the intention of the parties to the contracts when they made them to close out and settle them by the payment of the differences between the contract and the market prices of the property at the respective times fixed in the contracts for its delivery, and that the plaintiffs participated in or were aware of that intention? The answer is the testimony, admissions against interest, acts and conduct of the parties tending to prove such intention and the knowledge of the brokers of that intention or their participation therein.

[14] It was indispensable to the existence of substantial evidence that any of the contracts was a wager that competent evidence should be introduced that not only the party on one side, but the parties on both sides thereof, had the pernicious intention which constitutes the contracts wagers, and that the plaintiffs, the brokers, either participated therein or were aware of that intention. Bibb v. Allen, 149 U. S. 491, 492, 493, 13 Sup. Ct. 950, 37 L. Ed. 819; Ponder v. Jerome Hill Cotton Co., 100 Fed. 373, 377. 40 C. C. A. 416; Cleage v. Laidley, 149 Fed. 346, 351, 79 C. C. A. 284; Wilhite v. Houston, 200 Fed. 390, 392, 118 C. C. A. 542.

[15, 16] The fact that much the larger portion or all of the dealings of the plaintiffs or of the defendants or of the dealings on the New York Cotton Exchange were or are settled and discharged without the delivery or receipt of any property, does not constitute substantial evi-

dence to prove what portion of them was tainted with the pernicious intention and what portion of them was not so tainted—much less that the contracts in this case were tainted with that intention, for nondelivery of the property characterizes valid contracts settled pursuant to the lawful intention to close them out by set-offs and ringing off before the time for delivery fixed therein arises, to the same extent as it does those closed out with the pernicious intention. No more does the fact that the contracts disposed of without delivery of property call for many times the total receipts of cotton in New York, "which," said the Supreme Court of the disposition of the contracts for future delivery of grain in Chicago, "is no more wonderul than the enormous disproportion between the currency of the country and contracts for the payment of money, many of which in like manner are set off in clearing houses without any one dreaming that they are not paid, and for the rest of which the same money suffices in succession, the less being needed the more rapid the circulation." Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236, 250, 25 Sup. Ct. 637, 639 (49 L. Ed. 1031); Bibb v. Allen, 149 U. S. 481, 490, 13 Sup. Ct. 950, 37 L. Ed. 819.

[17] Nor does the fact that the defendants put up and the plaintiffs received and accepted deposits of moneys as margins to protect the plaintiffs from loss in executing the orders of purchase and sale of contracts for the future delivery of cotton tend to show that any of the parties to the contracts had or that the brokers were aware that any of them ever had the pernicious intention alleged. Brokers' claims for the recovery of balances of accounts which were partially secured by such margins where the dealings ordered were in like contracts for the future delivery of the cotton, have been often enforced. Bibb v. Allen, 149 U. S. 489, 490, 13 Sup. Ct. 950, 37 L. Ed. 819; Clews v. Jamieson, 182 U. S. 461, 484, 488, 21 Sup. Ct. 845, 45 L. Ed. 1183.

Let us now turn to the record, and test, by the principles, rules, and decisions to which reference has been made, the evidence of the pernicious intention of the parties to the contracts for the future delivery of cotton involved in this suit and the alleged participation or knowledge of the plaintiffs of that intention, to see whether or not that evidence was of such a substantial nature that the court below in the exercise of its judicial discretion could have sustained a verdict for the defendants on the ground that these were wagering contracts and transactions, if the evidence had been submitted to the jury and they had found in favor of the defendants.

Counsel for the defendants call attention to the following evidence in support of their claim that there was such substantial evidence: The testimony of Mr. Collens, one of the plaintiffs, that in a great majority of the cases of contracts for the future delivery of cotton there was no actual delivery thereunder, that the amount of contracts for the future delivery of cotton is largely in excess of the cotton raised, that in the five years the plaintiffs had been in business they had delivered about 10,000 bales of cotton on contracts for future delivery and that during that time their contracts for future delivery might have run to from 1,000,000 to 2,000,000 bales. But, as the authorities, which have been cited above, declare this testimony presented no substantial

evidence what proportion of the contracts for future delivery referred to were made with the pernicious intention—much less that the contracts under consideration in this case were made with that intention. 198 U. S. 250, 25 Sup. Ct. 637, 49 L. Ed. 1031; 149 U. S. 490, 13 Sup. Ct. 950, 37 L. Ed. 819.

[18, 19] Evidence that the first order of the defendants to make a contract of purchase of 100 bales of cotton to be delivered in March, 1917, was closed out at the close of the same day upon which it was made upon the defendants' order to make a contract of sale of the same amount on that day, and that all the defendants' orders for purchases and sales of cotton to be delivered in March, 1917, were closed out between October 30 and December 7, 1916. But the defendants had the lawful right to make a contract of sale for 100 bales subsequent to and on the same day that they made their contract of purchase of 100 bales and to close out and settle both of these contracts by set-off and ringing off and the payment or receipt of the difference on that day, and the legal presumption from the fact that they did close out these contracts before the time for delivery fixed therein, is that they intended to close them in the lawful method and not in the unlawful method, and this testimony as to the closing of this and the other contracts presented no substantial evidence of the pernicious intent indispensable to establish wagering contracts. The fact that all these contracts were closed out and settled months before the dates of delivery fixed in the contracts strongly tends to show that the parties did not intend to settle them by the unlawful method of the mere payment or receipt of the differences between the contract and the market prices at the times fixed in the contracts for the deliveries, but that they intended to settle them by the lawful methods of set-offs or ringing off.

The evidence that the defendants deposited with the plaintiffs margins to secure them against loss in executing the defendants' orders, has no tendency to show the pernicious intent. Margins for security are deposited where the parties have the lawful intent to close out their contracts by set-offs or by ringing off before the times of delivery as well as where they have the pernicious intent.

Finally, counsel insist that the letters, telegrams, and trade terms used in the correspondence between the plaintiffs and the defendants tend to show the evil intent. A careful reading of these letters and telegrams, and of other evidence in this case, however, has left no doubt that there was not at the trial, and is not in the record, any evidence that could sustain a verdict that the contracts here involved were wagering contracts, or that the plaintiffs participated in or were aware that the defendants or Mr. Barrett had any intention to settle the contracts by the payment or receipt of the differences between the contract prices and the market prices at the times fixed for the deliveries. On the other hand, one of the plaintiffs testified that he had no such intent, and that he did not know that any of the parties to the contract or transactions had such intent. No one came to testify that the plaintiffs did have such intent or knowledge and there was no substantial error in the charge of the court on this issue of wagering contracts.

[20] The last complaint of this trial is that the court instructed the jury that the undisputed evidence upheld the verity of the plaintiffs' account and that they should regard it as unsatisfied to the extent of $8,338.78. There was positive testimony in the case that the plaintiffs bought and sold contracts for the future delivery of the cotton as directed by the defendants, except in the cases of sales of the last 1,100 bales which they were justified in selling by the failure of the defendants to keep them protected against loss, that the result was that the expenditures of the plaintiffs were $8,338.78 more than their receipts arising from the orders of the defendants, that the plaintiffs correctly charged to the defendants in their account the amounts they expended and credited the amounts they received on account of such orders, and a copy of their account showing this balance of $8,338.78 owing by the defendants was introduced in evidence.

Counsel for the defendants argue that because on the cross-examination of one of the plaintiffs who had testified in chief to the facts just stated they presented a letter from the plaintiffs to the defendants dated January 31, 1917, to the effect that at the close of business on that day the defendants' account on the plaintiffs' ledger was "Dr. $1,000," which letter he testified was sent out by a mistake of one of the clerks or employés of the plaintiffs, the question of the amount of the indebtedness of the defendants should have been submitted to the jury. But there was no testimony that the statement in that letter was true, the witness to whom it was presented testified that it was a mistaken statement, there was no evidence that the defendants were misled by or acted upon it, and the testimony as to the actual state of the account between the parties was positive and without conflict as to the amount actually due from the defendants to the plaintiffs.

There was therefore no error in the charge on this subject, and the judgment below must be affirmed.

CARLAND, Circuit Judge (dissenting). The trial court charged the jury as follows:

"In this case, there is no controversy as to the regularity or good faith of the transactions. The only evidence is that the transactions were regular and conformed to the law, it shows their validity in terms, and sustains them, and there is no evidence to show that delivery of the cotton was not in fact intended. You are therefore instructed that the cotton purchases and sales here involved, were effected by the plaintiffs in a valid and legal manner, and you will so regard them, and give them effect in this case."

This charge took away from the jury the defense pleaded by the defendants to the effect that the transactions forming the basis of plaintiffs' cause of action were each and all speculative purely, and contrary to law and public policy, and were each and all gambling transactions. It is probably true that the imaginary cotton was bought and sold according to the rules of the game, but the rules of the cotton exchange and the provisions of the Cotton Futures Act did not legalize what would otherwise be a gambling transaction. The evidence shows that on October 31, 1916, defendants remitted to the plaintiffs $500 to cover margins, being $5 per bale. On the afternoon

of the same day defendants instructed the plaintiffs to purchase 100 bales of March cotton; that is, cotton to be delivered at sellers' option during the following March. Pursuant to such instructions plaintiffs bought 100 bales of March cotton at 18.61 cents per pound. On the same afternoon the defendants instructed the plaintiffs to sell this same cotton, and the plaintiffs did so for 19.20 cents per pound. The net profit was credited to the defendants' account, and that was the last of this transaction. The trades between the plaintiffs and defendants continued in this manner until December 11, 1916, when the defendants were long 1,100 bales of cotton. They failed or refused to put up margins to protect the plaintiffs on a falling market and thereupon the plaintiffs sold the whole 1,100 bales and charged the defendants with the loss. The loss during the time of the transactions mentioned was $8,338.78. The transactions seem to me to be the ordinary speculations on the rise and fall of the price of cotton. It is said in the charge of the court that there was no evidence to show that delivery of the cotton was not in fact intended. It is impossible to know, of course, just what the mind of man intends, except as we consider his acts and declarations. It may be said that the transaction will be presumed to have been lawful, in the absence of evidence to the contrary. I think there was evidence to the contrary, and upon the question of presumption, when it is considered that in 99 per cent. of these cotton trades the parties never give the delivery of actual cotton a thought, the presumption ought to be against the validity of the transaction instead of in favor of its validity. As a matter of sentiment I am of the opinion that one who gambles should pay his losses, but the law does not determine liability for sentimental reasons.

I think the court erred in taking the defense mentioned away from the jury or in not deciding it the other way itself. In some cases we ought to know as much as judges as we do as men.