## LAMSON BROS. & CO. v. TURNER.

## In re BROWN CONSOL. MILLING CO.

(Circuit Court of Appeals, Eighth Circuit. December 27, 1921.)

No. 5557.

1. **Bankruptcy** ⬡⟿467—**Findings by referee, approved by court, are not conclusive.**

Though the findings of the referee, approved by the District Court, with reference to a claim against a bankrupt's estate, are presumptively correct, and should be allowed to stand, unless some obvious error has occurred in the application of the law, or some serious or important mistake has been made in the consideration of the evidence, yet such findings are not conclusive.

2. **Gaming** ⬡⟿49 (1)—**Grain sales contract held lawful on face.**

Written contracts, given by a grain broker to its customer, confirming a sale or purchase for the customer, requiring the customer to keep on deposit sufficient funds to protect the broker, and stating that the actual receipt and delivery of the property in payment therefor was contemplated, appeared on their face to be lawful contracts, and that presumption could only be overthrown by evidence showing they were wagering contracts.

3. **Gaming** ⬡⟿2—**Orders to broker, to be executed in Illinois, are governed by the law of that state.**

Orders given by a Nebraska corporation in Nebraska to an agent for a Chicago brokerage firm, to be executed on the Board of Trade at Chicago, are contracts to be performed in Illinois, so that their legality is to be tested by the law of Illinois.

4. **Gaming** ⬡⟿12—**Under Illinois law, both parties must intend wager to make contract illegal.**

Under the law of Illinois, a contract for the sale or purchase of grain for future delivery is not illegal, unless both parties thereto intended that there should be no actual delivery, but that settlement should be made on the basis of market price on the date of delivery.

5. **Gaming** ⬡⟿49 (3)—**Testimony of bankrupt's officer held not to show wagering contract.**

Testimony by an officer of a bankrupt corporation that he did not intend to receive or deliver any grain on purchases or sales made by him on the Board of Trade, but meant to close out his contracts before delivery was due, though he did intend to perform any obligation incurred, does not show an intention of the bankrupt not to accept delivery when it was due.

6. **Gaming** ⬡⟿49 (3)—**That no deliveries were made is not conclusive that contracts were wagers.**

The fact that no deliveries of grain had been made under a series of contracts made for the bankrupt by grain brokers is not conclusive that the contracts on which the brokers based their claims against the bankrupt's estate were wagering contracts.

7. **Evidence** ⬡⟿134—**That other contracts were wagers held immaterial in determining intent.**

The fact that the contracts of most other customers of a brokerage firm were wagering contracts, in which no actual delivery of the grain was intended, is immaterial in determining the intention of the parties with reference to the contracts on which the claim against the bankrupt's estate was based.

---

⬡⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

8. **Gaming ☞12—Hedging by milling company is legal.**

The practice of hedging by purchase and sale for future delivery by a milling company, which is a dealer and shipper of grain, is common and lawful.

9. **Gaming ☞49 (3)—Evidence held not to show customer intended wagering contract.**

Evidence on a claim against a bankrupt's estate, filed by grain brokers, *held* not to show that the bankrupt had no intention to make or accept delivery of the grain sold or purchased, so as not to show that the contracts were intended as wagers.

10. **Corporations ☞372—Sales or purchases of grain for future delivery held within powers authorized by charter.**

A corporation, authorized by its charter to buy or sell grain, to make contracts of any kind or description, and to do any and all acts that a copartnership or natural person might do, has power to make sales or purchases of grain for future delivery.

Stone, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of Nebraska; J. W. Woodrough, Judge.

In the matter of the Brown Consolidated Milling Company, Bankrupt. From a decision of the District Court, allowing in part the claim of Lamson Bros. & Co., against O. F. Turner, as trustee in bankruptcy, and allowing an offset in favor of the trustee against the portion of the claim allowed, claimant appeals. Reversed, with directions to allow the claim as filed, and to disallow the offset.

Francis A. Brogan, of Omaha, Neb. (Alfred G. Ellick, Anan Raymond and John U. Loomis, all of Omaha, Neb., on the brief, for appellant.

Charles E. Abbott, of Fremont, Neb. (John F. Rohn and Edward J. Robins, both of Fremont, Neb., on the brief), for appellee.

Before SANBORN and STONE, Circuit Judges, and MUNGER, District Judge.

MUNGER, District Judge. This appeal seeks a review of the action of the court below in disallowing a part of a claim filed against the bankrupt's estate, and in allowing an offset in favor of the estate as against another part of the claim. The bankrupt corporation was engaged in the business of buying, selling, and shipping grain and grain products. Its principal place of business was at Fremont, Neb., where its mill was situated. Fred M. Brown was in the active charge of its business, and was secretary and treasurer of the corporation. The plaintiffs were partners engaged in the grain commission business, having a principal place of business at Chicago, but also having offices at Fremont and Omaha, Neb., in charge of employés who solicited and received orders for dealing in grain, and this partnership will hereafter be referred to as the plaintiff.

The bankrupt shipped to the plaintiff, at various times, many carloads of grain, drawing upon the plaintiff, with bill of lading attached, for the estimated value of the grain. The plaintiff paid these drafts, and the first item of its claim was for overpayments made

above the ascertained value of the shipments. The third item of its claim was for the amount of a promissory note given by the bankrupt for money loaned by the plaintiff. The correctness of these items was conceded by the trustee. The second item of claim was for a balance claimed by plaintiff, as the bankrupt's brokers, for advances made and commissions earned in making purchases and sales for the bankrupt, at its request, upon the Chicago Board of Trade. The trustee asserted that this balance arose from gambling transactions between the bankrupt and the plaintiff. He also asserted a claim of offset against the conceded items due to the plaintiff, alleging that Mr. Brown, purporting to act in the bankrupt's name, had wrongfully used the bankrupt's funds without its consent or knowledge, in payments to the plaintiff of amounts which he had lost in wagering transactions in grain, and asked for an allowance of the amount thus lost. The referee in bankruptcy disallowed the second item of plaintiff's claim, and allowed the offset claimed by the trustee, finding that the bankrupt had engaged through the plaintiff in buying and selling grain upon the Chicago Board of Trade upon "margins."

Upon a petition for review the District Court found the same balances to be due that the referee had found, and that neither the bankrupt nor plaintiff had had any intention, in the disputed transactions, that there should be any delivery of grain, and that these transactions were wagers, but also found that each order given by the bankrupt to the plaintiff's agents was immediately transmitted to the plaintiff at Chicago, and corresponding orders were, by the plaintiff, executed on the floor of the Board of Trade, and that both plaintiff and the brokers with whom they made such corresponding trades intended to carry out these contracts according to the rules of the Board of Trade, and to receive or deliver the grain contracted for, and to make payment therefor, unless the liability should be set off by other transactions, as authorized by the rules, and that plaintiff did make settlement of these contracts.

[1] The effect of these findings is discussed by counsel, and it must be conceded that they are to be taken as presumptively correct, and should be allowed to stand, unless some obvious error has occurred in the application of the law, or some serious or important mistake has been made in the consideration of the evidence, but they are not conclusive. Houck v. Christy, 152 Fed. 612, 614, 81 C. C. A. 602; In re Hawks (D. C.) 204 Fed. 309, 312.

The evidence discloses that the bankrupt, acting through Brown, gave a series of orders to the plaintiff's employés in charge of the Fremont and Omaha offices, directing the purchase or sale upon the Chicago Board of Trade of specified quantities of grain for future delivery, and making deposits of money, unless the plaintiff already held a balance of the bankrupt's money in its hands. When such an order was given, it was at once telegraphed to plaintiff by its agents, and the plaintiff at once purchased or sold corresponding amounts of grain in conformity to the bankrupt's order; and a message was sent plaintiff's agents, reporting the execution of the order, and the bankrupt was so informed; but it was also informed that it was subject to confirmation at Chi-

cago. Within a few days a letter of confirmation was sent the bankrupt from the plaintiff at Chicago, containing the details of the transaction, and notifying the bankrupt that it must keep on deposit with plaintiff funds sufficient to protect it against changes in values of the grain, and that in case such funds, in the plaintiff's judgment, became insufficient to give this protection, the bankrupt understood that plaintiff was authorized to dispose of the contract on the open market without further notice. It also stated that the plaintiff reserved the right to substitute other principals with bankrupt, and that all purchases and sales made for the bankrupt were made according to and subject to the rules and customs of the exchange where the trades were made. It also stated that all transactions made by plaintiff for bankrupt's account contemplated the actual receipt and delivery of all the property and payment therefor.

[2] The plaintiff executed all of the bankrupt's orders by making lawful and binding contracts of purchase or sale, and all of these contracts were performed or legally satisfied by the plaintiff. The rules of the Board of Trade allowed delivery, when delivery was due, of warehouse certificates for the requisite amount of grain in Chicago. On its face each of these contracts of the bankrupt appeared to be lawful and this presumption could only be overthrown by evidence showing it to be invalid. Bibb v. Allen, 149 U. S. 481, 492, 13 Sup. Ct. 950, 37 L. Ed. 819; Wilhite v. Houston, 200 Fed. 391, 392, 118 C. C. A. 542; Boyle v. Henning (C. C.) 121 Fed. 376, 380; Browne v. Thorn (C. C. A.) 272 Fed. 950, 952; Gettys v. Newburger (C. C. A.) 272 Fed. 209, 216.

[3, 4] As these orders were given to the plaintiff, as the bankrupt's broker, to be executed upon the Board of Trade at Chicago, the legality of the transactions is governed by the laws of Illinois, and in Illinois such a contract is void only when both parties intend it as a wager, to be settled by the payment of differences, and not by the delivery of grain. Berry v. Chase, 146 Fed. 625, 629, 77 C. C. A. 161; Wilhite v. Houston, 200 Fed. 390, 392, 118 C. C. A. 542; Beal v. Carpenter, 235 Fed. 273, 278, 148 C. C. A. 633; Irwin v. Williar, 110 U. S. 499, 508, 4 Sup. Ct. 160, 28 L. Ed. 225; Bibb v. Allen, 149 U. S. 481, 489, 13 Sup. Ct. 950, 37 L. Ed. 819; Clews v. Jamieson, 182 U. S. 461, 481, 491, 21 Sup. Ct. 845, 45 L. Ed. 1183; Browne v. Thorn (C. C. A.) 272 Fed. 950, 952; Gettys v. Newburger (C. C. A.) 272 Fed. 209, 217, 219.

[5, 6] Mr. Brown, for the bankrupt, testified that he did not intend to receive or deliver any grain on any of these purchases or sales, but he explained this statement by saying that he always meant to close out all of his contracts before delivery was due, by giving an order of sale or purchase that would balance his prior order. He also testified that he intended to perform any obligation incurred. This testimony falls far short of showing an intention of the bankrupt not to accept delivery, when delivery should be due. Rountree v. Smith, 108 U. S. 269, 275, 2 Sup. Ct. 630, 27 L. Ed. 722; Cleage v. Laidley, 149 Fed. 346, 350, 79 C. C. A. 284. The trustee urges that the fact that no grain was either delivered or tendered for delivery demonstrates

that no delivery was intended; but it also appears that no contract was carried through to the time when delivery was required. So this fact is inconclusive. Cleage v. Laidley, supra; Wilhite v. Houston, supra; Kirkpatrick v. Adams (C. C.) 20 Fed. 287.

[7, 8] It is also urged that the contracts of most of the customers of the Fremont and Omaha offices were speculative and resulted in no deliveries, but what others intended and what others did does not determine the question of the bankrupt's intention. Rountree v. Smith, 108 U. S. 269, 276, 2 Sup. Ct. 630, 27 L. Ed. 722; Flowers v. Bush & Witherspoon Co., 254 Fed. 519, 521, 166 C. C. A. 77; Browne v. Thorn (C. C. A.) 272 Fed. 950, 953; Gettys v. Newburger (C. C. A.) 272 Fed. 209, 219. As against these circumstances are the facts that bankrupt was a milling company, known to plaintiff to be a dealer and shipper of grain; that hedging by such dealers is a common and lawful practice (Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236, 249, 25 Sup. Ct. 637, 49 L. Ed. 1031; Gettys v. Newburger [C. C. A.] 272 Fed. 209, 218) ; that the contracts appeared to be lawful when made; and that no claim is made that the bankrupt ever notified plaintiff or its agents of any intention not to perform the contracts, if delivery became due, and the bankrupt's manager testified that he intended to fulfill all obligations.

[9] There is but one conclusion to be drawn from these facts, and that is that there was no proof of an intention of the bankrupt, at the time it entered into these contracts, not to accept or make delivery, or to merely make settlement of the differences in prices. But, even if the intention were such as it now asserts, there is no evidence that the plaintiff was aware of such intention, or that it did not intend to make or accept deliveries, and therefore the claim of the trustee that these were gambling contracts cannot be sustained, because of the lack of mutual intention to make wagering transactions. Spring & Co. v. Carpenter, 154 Fed. 487, 488, 83 C. C. A. 327; Parker v. Moore, 115 Fed. 799, 803, 53 C. C. A. 369; Parker & Co. v. Moore (C. C.) 125 Fed. 807, 808; In re Trion Mfg. Co. (D. C.) 214 Fed. 161; Bailey & Graham v. Phillips (C. C.) 159 Fed. 535, 539; Gettys v. Newburger (C. C. A.) 272 Fed. 209, 221.

[10] The trustee also makes the claim that wagering contracts were beyond the corporate powers of the bankrupt. What has been said disposes of this objection, but it may be noted that the making of sales or purchases for future delivery of grain is embraced within the corporate powers of the bankrupt, as its charter authorized it to buy or sell grain, to make contracts of any kind or description, and to do any and all acts that a copartnership or natural person might do.

The conclusions already stated make it unnecessary to discuss other contentions. The decree of the lower court will be reversed, with directions to allow the plaintiff's claim as filed, and disallowing the trustee's claim of set-off.

STONE, Circuit Judge (dissenting). This is an appeal from the disallowance of part of a claim against the bankrupt estate of the Brown Consolidated Milling Company. The claim as filed totaled $7,-

146.52, and was allowed for $2,081.18. It is because of the disallowance of the difference between these sums that this appeal is brought.

The claim consisted of three general items: Of $1,284.49, constituting a balance of account arising out of a shipping account for the purchase and sale of actual grain; $5,191.67, representing a promissory note for $5,000, with accrued interest; and $670.36, a balance of account, alleged by the trustee to have arisen from grain option deals. The first two items were confessed by the trustee. He opposed the last item of $670.36, as arising out of gambling or option dealings. He also sought a reduction of the admitted claim by $4,-394.98, contending that the sum of $4,394.98 was a balance due the estate from the sum of $8,925, which had been paid claimant on account of similar dealings. The trustee based his objections upon the grounds that the bankrupt had no charter authority to engage in such gambling transactions, that the official of the bankrupt using its funds therefor had no authority to so do from the stockholders or directors of the bankrupt, that the deals were purely option or gambling transactions, and that such were made in the state of Nebraska, where they were declared by statute to be unlawful.

The findings of fact and conclusions of law of the referee were very meager, but were to the effect that the bankrupt, through its officers, had been engaged with the claimant in illegal grain option deals to the extent contended by the trustee, and, on that ground, disallowed the third item of the claim for $670.36, and allowed a reduction of the admitted claim by $4,394.98, leaving the claim as thus reduced and allowed at $2,081.18. Upon a petition for review, the District Court, being of the opinion that the report of the referee did not sufficiently find the facts to enable the court to determine the same, heard the claim and objections thereto de novo upon the evidence submitted to the referee. The court found that the manager of the bankrupt, "purporting to act in the name of said corporation," had engaged in unlawful grain option transactions with claimant in Nebraska in the particular and to the extent urged by the trustee, and reached the same result as the referee.

There are two points urged by appellant upon the merits: First, that the evidence does not sustain the finding by the referee and trial court that the questioned transactions were gambling deals; second, that, even though they were such, yet the trustee cannot avail himself of that condition. The first point must be examined in the light of the presumption as to the correctness of the finding, which can be overturned only if there is no substantial supporting testimony, or unless obvious error or mistake is indicated. The evidence upon this point was conflicting, but there was very substantial, and even convincing, testimony in support of the finding, and no obvious error or mistake has been discovered.

Another point of fact, claimed by appellant to vitally affect the finding that the deals were gambling transactions, is whether the contracts are to be regarded as made in Nebraska or in Illinois; its contention being that the Illinois law governs, and that that law requires

the unlawful intent not to deliver or accept actual grain shall be shared by both parties, while the Nebraska law makes the intention of one of the parties sufficient. The referee made no specific finding as to where the contracts were made, but found generally that they were gambling transactions, while the trial court went more into detail in its finding, and determined that the contracts were made in Nebraska. There is no necessary conflict in these findings. Besides, the evidence as to what was done in making these contracts does not conflict in essentials. I think that the evidence substantially supports the conclusion that the contract between these parties, which was one of brokerage, was made in Nebraska. The fact that what was to be done under these contracts·was to be performed in Illinois does not affect the situs of these contracts. It also seems to me that the case of Lamson Bros. & Co. v. Bane, 206 Fed. 253, 124 C. C. A. 121, 46 L. R. A. (N. S.) 650, decided by this court, determines the situs of this contract to be in Nebraska. I therefore conclude that the finding that these contracts were gambling transactions must stand.

The second contention is that, even though these transactions were gambling contracts, yet the trustee, as to them, stands in the shoes of. the bankrupt, and cannot defeat the claim for $670.36, nor offset the counterclaim for $4,394.98. Being a Nebraska contract, the right of recovery for losses would be governed by the law of that state. Lamson Bros. & Co. v. Bane, supra. The Supreme Court of that state, in case of Ives v. Boyce, 85 Neb. 324, 123 N. W. 318, 25 L. R. A. (N. S.) 157, which involved similar wagering dealings, has decided that no recovery can be had, but that the parties will be left as they are. This would conclude this claimant as to the item it claims of $670.36. Also see Embrey v. Jemison, 131 U. S. 336, 9 Sup. Ct. 776, 33 L. Ed. 172; Irwin v. Williar, 110 U. S. 499, 4 Sup. Ct. 160, 28 L. Ed. 225; Sprague v. Warren, 26 Neb. 326, 41 N. W. 1113, 3 L. R. A. 679. Supposing, for the moment, that the corporation is subject to the same rule, had it endeavored, by suit, to recover its losses of $4,394.98, would the same rule apply where it would seek to reduce a legitimate claim in suit by setting forth such losses as a counterclaim? It would seem that the rule applies to counterclaims and set-offs. Higgins v. McCrea, 116 U. S. 671, 6 Sup. Ct. 557, 29 L. Ed. 764; 20 Cyc. 951, and citations. Therefore the offset of $4,394.98 urged by the trustee cannot be sustained, unless either a trustee in bankruptcy stands in a more favorable position than the bankrupt, or the transactions here involved were not authorized by the bankrupt. If the trustee occupies any such favored position, it must spring from his relation to and representation, in a sense, of the creditors of the bankrupt. A creditor of a gambler, however, is in no better position than the gambler as to recovery of gaming losses.

There remains the contention that these gambling transactions were. not authorized by the corporation, and not binding upon it. The charter powers of the bankrupt are set forth in the objections of the trustee to the claim. Such powers, while broad, give no basis for any claim that they authorize the bankrupt to engage in option grain dealings. It would be unbelievable that the state of Nebraska, which prohibits such contracts, would grant the bankrupt a charter right to

enter into them. Nor did the stockholders or directors attempt to grant such authority. Before any of these transactions, the board of directors passed a resolution "that no option deals on grain shall be made without the consent of the majority of the officers of the company." The company had four officers during the time here material. May 13, 1915, there was a change in stockholders and in officers. The substantial evidence is that only two of these officials knew of the option deals before the above date, and then only for a portion of that time, and that only one, the participant, had any knowledge thereof after this date and up to the bankruptcy. Nor could they have discovered the nature of the transactions from the regular books of the company, though they might have done so by going through the letter files. The evidence supports no conclusion that there was any authority from the bankrupt to use its funds in such transactions. Nor could the bankrupt, nor can its trustee, be estopped from presenting this offset, because such winnings as there were came to it and were used by it. The reason is that these transactions are not only ultra vires, but are positively illegal, and no action of the corporation could constitute an estoppel or ratification, so as to make it effective.

I conclude, therefore, that the result reached by the referee and trial court was correct, and should be affirmed.